UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-11045-GAO

MICHAEL BAEZ,
    Plaintiff

    v.

MICHAEL MALONEY, et al.,
    Defendants

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT

Introduction

The *pro se* plaintiff, Michael Baez, is an inmate lawfully confined in the custody of the Commonwealth of Massachusetts Department of Correction, where he is serving an aggregate sentence of five to seven years for Armed Robbery While Masked, Use of Body Armor in the Commission of a Felony, Assault by Means of a Dangerous Weapon. He is presently incarcerated in the Department of Correction Departmental Disciplinary Unit ("DDU") serving administrative sentences imposed after being found guilty of assaulting the defendants, assaulting another inmate with a razor, and biting correction officers. He has a consolidated prospective discharge date on his criminal sentence of November 30, 2007, on which date he is expected to be released to the streets..

Baez has filed the instant action alleging excessive use of force on him on June 26, 2002. The defendants are former superintendent of the Souza Baranowski Correctional Center Edward Ficco, other DOC employees John Flowers, Robert Lashua, Edmund Preston, Michael Cravedi, David Shaw, Joseph Rackett, Charles Hooper, and David Bolduc, and former DOC employee Brian McManus. The defendants are entitled to summary judgment because the uncontroverted evidence establishes that the members of the

2

extraction team, Lashua, Flowers, Preston, Cravedi, Shaw, Rackett, Bolduc, and McManus either did not touch Baez, or used only the amount of force necessary to disarm and place Baez in restraints during an authorized use of force to extract him from his cell in which Baez repeatedly struck McManus, Preston, and Bolduc with a deadly weapon after rigging a "trap" that he, in his own words, intended to use to "fight the advance" and give him "time to strike." Superintendent Ficco is entitled to judgment because the uncontroverted evidence shows that he was not present during the forced cell extraction, and Baez has made no personal allegations against him.

In the alternative, the defendants are entitled to qualified immunity because an objectively reasonable correction officer would not have concluded that the amount of force used by the defendants was excessive, as they disarmed, subdued, extracted, stripped, searched, and secured this armed and violently combative inmate, who is able to slip out of restraints and has a history of concealing weapons.

## I. **Statement of Uncontested Material Facts.**

The uncontroverted evidence before the Court consists of the defendants' Affidavits (Exhibits A – C), a Certified Record of Administrative Proceedings (Exhibit E), and the Plaintiff's Admissions (Exhibit D) and .[1] The plaintiff did not file a verified complaint.

The Souza Baranowski Correctional Center ("SBCC") is a maximum-security state prison located in Shirley, MA, one of only two such facilities in the Commonwealth. On

---

[1] The plaintiff did not make any responses to the Defendants' Requests for Admissions, served on him twice, once on April 2, 2007, the second time on May 14, 2007. In the May 14 reminder to Baez, counsel for the defendants included a letter explaining that "pursuant to Fed. R. Civ. P. 36, a failure to respond to requests for admissions is considered to be an admission of the facts set forth therein." Exh. D. Baez did not respond and these facts should be admitted as conclusively established pursuant to FRCP 36(a) and (b).

3

June 26, 2002, Special Management inmates were rioting in their cells in the SBCC, K-3 South Special Management Unit. <u>Affidavit of Robert Lashua</u>, Exhibit A, ¶6. Inmates had refused to return their meal trays during the day, were covering their doors' observation windows, throwing trash out on the tier, and flooding their cells and the tier by blocking their toilets and repeatedly flushing. Exh. A, ¶6. The water was turned off to the cells, and the inmates were ordered to be removed from the K-3 housing unit. Exh. A, ¶ 6. Lt. Robert Lashua was assigned as a Team Leader for a move team at about 3:15 p.m. and participated in several forced extractions during the afternoon and evening. Exh. A, ¶6.

Michael Baez was a special management inmate in the North K-3 Special Management Unit (SMU) on June 26, 2002, and was identified as an active participant in the inmate disruption, who had to be removed from the K-3 unit Exh. A, ¶7. <u>Plaintiff's Admissions</u>, (Exh. D) No. 4. He had the capacity to make weapons from the hard plastic food tray he refused to return. <u>Id.</u> Also, Baez is double-jointed and able to slip out of handcuffs. <u>Admission</u> No. 2. He had a disciplinary history for possessing weapons while in Department of Correction custody. <u>Admission</u> No. 3.

Pursuant to 103 CMR 505, <u>Standard Operating Procedures</u>, IV.B.1, whenever an inmate is to be moved outside of the SMU, he must be handcuffed behind his back and placed in leg irons. Exh. A, ¶ 8. The regulations require that these restraints must be placed on the inmate before the cell door is opened. Exh. A, ¶8. Routinely, pursuant to 103 CMR 505, <u>Standard Operating Procedures</u>, IV.B.3, all movement of inmates outside of the SMU must be by hand-on escort by two staff members. Exh. A, ¶9.

4

On June 26, 2002, Lt. Lashua gave Baez several orders to step to his cell door to be handcuffed and leg irons applied so that he could be moved. Exh. A, ¶10. Baez refused every order to come to his cell door to be cuffed. Exh. A, ¶11. Admission No. 15. The Shift Commander, Captain Shaun Dewey, received authorization for Superintendent Edward Ficco, to use physical force to remove Baez from his cell and relayed that order to Lt. Lashua. Exh. A, ¶12. Captain Dewey advised Lt. Lashua that chemical agents could not be used in Baez's cell for medical reasons. Exh. A, ¶13; Exh. B, ¶49. Baez was informed that unless he complied with orders to step to his cell door to be cuffed and removed from his cell, that the superintendent had authorized the use of physical force to remove him from his cell. Exh. A ¶¶10, 17.

At about 8:51 p.m., Lt. Lashua, as Team Leader, assembled an extraction team assigned as follows:  Brian McManus, shield person; David Bolduc, left extremity; David Shaw, right extremity; Edmund Preston, restraints; and Michael Cravedi, alternate. Exh. A, ¶14.The responsibilities of each position on an extraction team is set forth in Department of Correction policy and training.

The Team Leader supervises the team and gives all verbal commands to the team and the inmate. Exh. A, ¶ 15. He is responsible for briefing and the deployment of chemical agents. Exh. A, ¶ 15. The Team Leader is responsible for determining the appropriate course of action in the circumstances created by the inmate for each extraction,  and makes the final attempt to obtain voluntary cooperation from the inmate before the actual deployment of a chemical agent or physical force. Exh. A, ¶ 15. The Team Leader must position himself to maintain constant visual contact of the events. Exh. A, ¶15.

5

The Shield Person assures the proper use of the shield, which includes entering the cell first, making the first contact with the inmate, and using a forward and downward application of physical force to bring the inmate to the floor for cuffing. Exh. A, ¶ 15. He then assists in controlling the inmate for cuffing. Exh. A, ¶15.

Both the Right and the Left Extremity persons help to subdue the inmate by placing their hands on the shoulders of the Shield Person as he tries to push the inmate to the floor, adding additional strength to the ability of the Shield Person to control the inmate's movements and bring him to the floor for cuffing. Exh. A, ¶15. Then the Right Extremity Person provides support on the right side of the Shield Person and is responsible for controlling the inmate's upper body on the right, and the Left Extremity Person does the same, controlling the inmate's upper body on the left side. Exh. A, ¶15.

The Restraint Person is responsible for controlling the inmate's lower body while the team tries to contain the inmate's movements. Exh. A, ¶ 15. He is responsible for applying hand and leg restraints. Exh. A, ¶15. The extraction team members continue to maintain control of the inmate according to their respective positions until after the inmate is stripped, searched, examined and treated by medical staff, and secured in another cell. Exh. A, ¶15.

At about 8:35 p.m., acting as an impartial party, the SBCC Mental Health Director for the University of Massachusetts Correction Health Services, Mark Radosta, went to Baez's cell in an attempt to persuade Baez to comply with the Department of Correction's orders to "cuff up." Exh. A, ¶ 17.  Mr. Radosta warned Baez that the Superintendent had authorized the use of physical force to remove Baez if he did not comply. Exh. A, ¶ 17. Mr. Radosta reported the above information to the Shift Commander Captain Shaun Dewey and Lt.

6

Lashua, and added that Baez did not acknowledge his presence, but that he had heard the sounds of objects, possibly metallic, banging against each other inside Baez's cell. Exh. A, ¶17.

During the evening, SBCC Inner Perimeter Security (IPS) Sergeant Nestor Cruz and C.O. Edwin Gonzalez reported that Baez had been yelling threats in Spanish to the other inmates on the tier about his intentions. Exh. A, ¶18. Baez was yelling that he had rigged his door with pieces of his meal tray, silverware, magazines and cosmetics wedged in his door track. Exh. A, ¶19. Baez said that he had some type of barrier tied up that was "not going to be cut down for a long distance", and that someone was going to have to come through the door to cut it down. Exh. A, ¶ 19. Baez said that he stood up "like a Samurai" and was flashing his "swords." Exh. A, ¶19. Baez told the inmates that his weapons were scaring the officers away and that he would stab a K-9 dog if it were used against him. Exh. A, ¶20.

Gonzalez also reported that Baez was telling the other inmates that he would not go down without a fight. Exh. A, ¶ 21. He was repeatedly reminding the other inmates that he "couldn't be gassed." Exh. A, ¶21. When other inmates warned Baez that the canine unit would be used against him, Baez laughed. Exh. A, ¶22.  Baez bragged that the officers would have to fight to get through the barrier, giving Baez time to "fight the advance," and "time to strike." Exh. A, ¶23.

At about 9:00 p.m., Lt. Lashua approached Baez's cell door, identified himself, and told Baez that the use of force was authorized to remove him from his cell if he did not comply with his orders. Exh. A, ¶24. Baez had completely covered the observation window in his cell door so that correction officers could not see in, and this also violated the rules of the

7

Department of Correction. A, ¶25. Lashua ordered Baez to uncover his window and present himself to be cuffed. Exh. A, ¶26. Baez refused. Exh. A, ¶27. Lashua then ordered an officer to open the food slot or "wicket" lower down in the cell door. Exh. A, ¶28.

When Lashua looked through the food slot, he saw that Baez had strung numerous trip ropes made from torn bed sheets throughout his cell. Exh. A, ¶29. Baez was sitting on his desk with his hands between his legs so that Lashua could not see if he had anything in his hands. Exh. A, ¶30.  He ordered Baez to show his hands and Baez refused. Exh. A, ¶31. As Sgt. Cravedi and Lt. Lashua continued to observe Baez through the slot, discussing the logistics of entering the cell, Baez suddenly leaped from his desk and charged the door, with two sharpened instruments attached to his wrists. Exh. A, ¶32; Exh. B, ¶25; Admission  No. 18. Baez slammed a large broken food tray through the food slot and into the shield Sgt. Cravedi was holding against the door, then kicked his foot out of the wicket striking the shield. Exh. A, ¶33. Admissions Nos. 14-17.

Lt. Lashua ordered that the wicket be sealed, ordered the team to stand down, and left the tier to consult with Captain Dewey. Exh. A, ¶ 34. They decided to remove the team from the tier and reassess the situation. Exh. A, ¶34. At about 9:12 p.m., Cravedi and Lashua briefed Captain Dewey on the types of weapons Baez had, the condition of his cell and his violent demeanor. Exh. A, ¶ 35. Captain Dewey told the team to stand by and he would notify his chain of command. Exh. A, ¶35. At about 10:19 p.m., Captain Dewey briefed Lashua's team and introduced three new members to the extraction team, C.O John Flowers, C.O. Joseph Rackett,  the Canine Unit Sgt. Raymond Harvey and his dog, Rio. Exh. A, ¶36.

8

Capt. Dewey ordered Lashua's team to      approach Baez's cell and inform him that the K-9 unit was on the tier, and order him to come to the door to be cuffed up and removed from his cell. Exh. A, ¶37. At about 10:23 p.m., Lashua again approached Baez's cell door and informed Baez that the K-9 unit was on the tier. Exh. A, ¶ 38. Lashua opened the wicket to view Baez;  Baez refused orders to cuff up, but threw out numerous sharpened weapons made from some of the pieces of his meal tray. Exh. A, ¶38. Usually, just the appearance of the canine unit on the tier is sufficient to convince an inmate to comply with orders to come to the door and be cuffed. Exh. B, ¶47. Baez continued to refuse, and Lashua ordered the wicket closed and the team off of the tier at about 10:25 p.m. Exh. A, ¶39.

Usually, the next level of force that is used is the application of chemical agents to the inmate's cell. Exh. B, ¶49. This will cause the inmate's eyes to water and, in many cases, the inmates begin to comply with orders to cuff up. Exh. B ¶49. In the rest, the chemical reaction distracts and subdues the inmate enough so that the amount of force is necessary to apply restraints is reduced.  Exh. B, ¶49. A chemical agent could not be used on Baez's cell. Exh. B, ¶49.  Lt. Lashua and the team discussed other options with the intent of using the minimum amount of force necessary to gain entry to Baez's cell, disarm and subdue him, and apply handcuffs and leg irons. Exh. B, ¶50.  They talked about the possible use of various munitions, but rejected these ideas in favor of adding two more officers to the team. Exh. B, ¶51. These officers would carry an extra shield and act as a wall to prevent Baez from escaping from his cell and attacking the unprotected personnel out on the tier. Exh. A, ¶¶42-43; Exh. B, ¶51.

9

At about 11:08, the extraction team    received a third briefing from Capt.
Dewey. Exh. A, ¶ 40. They discussed modifying the move team configuration given several
factors, such as Baez's violent disposition; the strong possibility of his being possession of
weapons; the fact that chemical agents could not be used; and the fatigue of the team, most
of whom had been working a complete shift since 3:00 p.m., and had moved several other
inmates from the tier. Exh. A, ¶40. The extraction team was modified to place Officer
Bolduc as an additional shield person, Officer Flowers as Restraint Person, and Officer
Preston as Left Restraint Person. Exh. A, ¶41.

The extraction team members rehearsed the team's positions several times because of
the additional staff and shield, and the impediments they might create in entering the narrow
doorway and entry area just inside the cell door. Exh. A, ¶44. The defendants went to an
empty cell that was identical to Baez's and practiced in several dry runs every possible
scenario that could occur on entering. Exh. B, ¶52; Exh. C, ¶13. This was to ensure that the
team was prepared to subdue and restrain Baez using the minimum amount of force
necessary in the circumstances. Exh. B, ¶52-54; Exh. C, ¶13. The goal was to reduce the risk
of injury to both Baez and staff in the use of force. Exh. B, ¶53.

At about 11:12 p.m., Lt. Lashua again approached Baez's cell door and ordered him to
uncover his window and to present himself to be cuffed, and again Baez refused. Exh. A,
¶45. Admission No. 21. Lashua ordered the wicket to be opened, and he saw Baez sitting
again on his desk at the rear of his cell. Exh. A, ¶46.  Baez was sitting in such a way that
Lashua could not determine what, if anything, he had in his right hand. Exh. A, ¶46. Lashua
ordered Baez to show his right hand and Baez refused. Exh. A, ¶47.

10

At about 11:13, p.m., Lashua ordered the        team to stand down, and left the tier to consult with Capt. Dewey one last time. Exh. A, ¶48. Capt. Dewey and Lashua determined that despite their efforts, Baez's actions indicated that he would not comply peacefully with being removed, that he posed a serious threat of grave bodily harm to anyone entering his cell and anyone on the tier if he escaped from the cell unrestrained, and that the extraction team would have to use whatever physical force was reasonably necessary to disarm, restrain, and remove him from his cell. Exh. A, ¶49.

Lashua returned to his team and briefed them one last time to ensure that everyone was aware of his role. Exh. A, ¶50. At about 11:16 p.m., Lashua gave Baez one last chance to comply without the use of physical force, and ordered him to uncover his window and submit to cuffing, and Baez again refused. Exh. A, ¶51. Lashua ordered the team to go into the cell to remove Baez. Exh. A, ¶52.

The progression in a forced cell extraction such as starts with the verbal orders to submit to placement of restraints to the use of physical force, and is stopped at any time the resisting inmate desists and submits peacefully to the application of restraints. Exh. B, ¶8. If the inmate has refused repeated orders to step to the closed door of his cell and be cuffed, the "move" or "extraction" team is given the order to open the door and enter the cell. Exh. B, ¶9. At this point, the goal of the team is to rapidly obtain control of the inmate by physically forcing him quickly to the floor for the application of restraints. Exh. B, ¶9. The reason for the requirement of bringing the inmate to the floor is that, by his repeated refusals to submit to restraints after being warned that the use of force is authorized, the inmate has

11

already demonstrated that he is a threat to  security, and that he will not comply unless force is used. Exh. B, ¶10.

The officers on the present extraction team had received special training on the proper use of force on inmates, as they were all members of either the Department of Correction Special Operations Tactical Response Unit of Special Response Team. Affidavit of Michael Cravedi, Exh. B, ¶¶3, 5. It is common knowledge in a maximum-security environment that the goal of inmates in a forced cell extraction is to inflict as much injury on staff as possible to enhance the inmate's reputation among other inmates. Affidavit of David Bolduc, Exh. C, ¶10. Inmates who want to inflict serious injuries on correction officers will attach trip wires and "web" their cells in order to slow down the entering officers in a forced extraction. Exh. C, ¶8. Because the narrow space requires the officers to enter the cell one at a time in single file, the inmate uses the trip wires to gain a tactical advantage. Exh. C., ¶9. Baez intended this web to be a "trap" for the move team officers. Admission No. 13. The rigging of the trip wires gives the inmate enough time and opportunity to find the vulnerable spots on the officers to enable him to stab the officers, even when they are wearing protective gear. Exh. C, ¶8. The trip wires also impede the officer's ability to subdue the inmate and make it more likely that the inmate will be able to escape from the cell and make it into the corridor wearing no restraints. Exh. B, ¶31. This places the personnel standing nearby in the corridor at grave risk of harm, and can lead to a hostage-taking situation. Exh. B, ¶31. The sequence of event that is used in every use of force in a cell extraction is set forth in policy. Correction officers are trained and adhere to these Department of Correction regulations, including 103 CMR 505, Use of Force. Exh. B, ¶6. Addendum. At all times, officers are trained to use the

12

minimal amount of force necessary to place   the inmate in restraints, i.e. handcuffs and waistchain, and leg irons, and only after authorization from the superintendent or commander of the Special Operations Unit. Exh. B, ¶7.

The opening of the cell door to the unrestrained inmate would create a serious risk of injury to staff, and threaten the security of the institution. Exh. B, ¶11. Immediate control of the inmate in his cell is of utmost importance to reduce the risk. Exh. B, ¶11. In addition, Special Management (SMU) inmates, such as Michael Baez, are by regulation required to be in restraints before the cell door can be opened. Exh. B, ¶12. The reason is that SMU inmates have a history of violence requiring special management. Exh. B, ¶12.

Once the cell door is opened, the resistant inmate has waived all prior opportunities to avoid the use of force. Exh. B, ¶13. If the inmate quickly submits to the application of restraints once the extraction team brings him down to the floor, the use of force ceases, except that the officers keep a hands-on escort on the inmate until he is completely stripped, searched, and secured in a new cell. Exh. B, ¶14.  The more the inmate fights and struggles with the extraction team, however, the greater the amount of force the officers must exert in order to apply the handcuffs and leg restraints. Exh. B, ¶15.

Baez had so effectively jammed his cell door that it had to be taken down. Admission No. 19. At about 11:16 to 11:17 p.m.,  Sgt. Cravedi pulled it open. Exh. A, ¶53. Lashua, as Team Leader,  maintained a constant visual observation from his position outside the door of Baez's cell. Exh. A, ¶54.  As the officers entered, Baez leaped from his desk to the top of his bunk and stood with weapons aimed at the officers. Admission No. 25. Lt. Lashua saw that, as Officer McManus entered the cell first, Baez charged at him with a large sharpened

13

instrument, leaping from his desk to the top of his bunk, and striking repeatedly downwards at McManus's head and shoulders. Exh. A, ¶¶54-55. Admission No. 25. Officer McManus shouted, "Shank!" and made contact with his shield, but Baez continued to punch at McManus's head and body with the weapon. Exh. A, ¶56. Admission No. 30.

Lashua ordered the alternate team members to enter the cell as well, and they made secondary contact with Baez. Exh. A, ¶57. The whole team fell over the trip ropes hard along with Baez as they tried to evade his blows, and to contain him. Exh. A, ¶57, ¶58. Baez hit his head and face on the concrete floor with a hard blow as he fell off of the bed, struggling to stab the officers. Exh. A, ¶59. Admission No. 32.

Lashua ordered Sgt. Cravedi to begin cutting the trip ropes that Baez had tied across his cell while Baez continued to struggle violently with the team as they tried to restrain him. Exh. A, ¶60. Admission No. 26. Baez struck Officers McManus, Preston, and Bolduc several times with the sharpened weapon as they struggled with the tangle of trip ropes and Baez. Exh. A, ¶61. Baez continued to stab at the officers until Officer Shaw, coming in around McManus, Preston, and Bolduc, who were still trying unsuccessfully to hold Baez down, managed to grab Baez's hand. Exh. A, ¶62. Admission No. 33. After a struggle, Shaw was able to wrestle the weapon from Baez's hand. Exh. A, ¶63. Officers were unable to apply restraints because of the layers of straps and wrappings Baez had tied around himself. Admission No. 34. Sgt. Cravedi cut the numerous wraps that Baez had tied around his wrists and ankles so that restraints could be applied and at about 11:20 p.m., the team exited the cell with Baez, and placed him on a mattress outside the cell where he was strip-searched. Exh. A, ¶64. Admission No. 36.

14

According to regulations, a complete     strip search for concealed weapons and contraband must be conducted on every inmate involved in a forced cell extraction before the medical staff sees him. Exh. B, ¶16. Immediately after the strip search, medical staff examines the inmate involved. Exh. B, ¶17.

Sgt. Cravedi continued to cut the many straps and wraps the inmate had tied to his body. Exh. A, ¶65. Admission No. 37. Baez's lower scrubs were cut off to facilitate the search. Exh. A, ¶66. When the search was completed, the team placed Baez into waist-chains and his handcuffs were removed. Exh. A, ¶67. The team transported Baez to the Nurse Protocol Room for an examination, with each member holding him down according to his designated position, and with a shield being held above Baez's face to prevent him from spitting on medical staff. Exh. A, ¶69. During this entire period, it was clearly Baez's intent to inflict serious bodily injuries on any officers with whom he came into contact. Exh. A, ¶70.

At any time that Baez complied with the verbal orders of staff to submit to being cuffed, the use of physical force to subdue him would have been halted. Exh. A, ¶72. Baez could at any time have cooperated with the extraction team inside of his cell by not struggling with the extraction team officers, but instead quickly lying on his cell floor and letting himself be held down until the application of handcuffs and leg restraints was completed. Exh. A, ¶74.

The goal of the extraction team in this case, as in every cell extraction, was to bring Baez to the floor and to apply restraints using the least physical force necessary to accomplish this goal. Exh. A, ¶75. By struggling violently with the officers at every step both while armed and after being unarmed, Baez increased the volatility of the move, the risk of serious injury to himself and the officers on the team, and the amount of physical force that the extraction

15

team had to use to contain and subdue him.  Exh. A, ¶76. Until Baez was completely strip-searched, the officers could not be sure that Baez was completely disarmed of weapons. Exh. A, ¶77. Even cuffed, an armed inmate is a serious threat to the safety of corrections staff and other inmates. Exh. A, ¶78. Baez posed an additional risk as he had demonstrated that he could slip free of restraints. Admission No. 2.

At about 11:50 p.m., the defendants were relieved by other correction officers, left the Nurse Protocol Room and the SMU, and had no further contact with Baez. Exh. A, ¶79. None of the relief correction officers who had contact with Baez after the defendants left are named as defendants in this lawsuit. Exh. A, ¶80.

Baez admits that removing him from his cell on June 26, 2002, required more time, more move team officers, and more force than that usually required to remove other similarly situated inmates in maximum-security because he posed a greater threat of harm to the officers than other inmates. Admission No. 40.

Lt. Lashua observed the actions of the defendants at all times including, but not limited to, the contact required to subdue Baez, defend themselves and others, disarm him, forcibly remove Baez from his cell, remove Baez's clothing, cut off the extra clothing, and wraps, conduct the strip search, and apply handcuffs, a waist chain, and leg irons. Exh. A, ¶81. In performing their duties as described above, the extraction team officers necessarily had to have contact with Baez, to move Baez around and to reposition his body and his extremities. Exh. A, ¶82. At all times, Baez continued to resist the officers and struggled with them. Exh. A, ¶83. No officer touched Baez improperly or with more force than necessary to defend himself and others, to effectuate the forced extraction, search Baez, apply restraints, or

16

contain him during the medical check.. Exh.   A,  ¶84.  At  no  time  did  Superintendent

Edward Ficco have any contact with Baez, nor was he present. Exh. A, ¶86. Hooper only

operated a camera and was not on the extraction team.

No  officer  punched  Baez  or  abused  any  part  of  Baez's  body  in  order  to  cause

unnecessary pain or injury during the entire incident. Exh. A, ¶85; Exh. B, ¶80. Officer

Bolduc was in close proximity with Baez from the entire time from when the team entered

his cell until they left the Nurse Protocol Room. Exh. C ¶47. At no time did anyone strike

Baez in the face with his hand or fist, or have any improper contact with his genitals. Exh.

C, ¶47. Every physical contact that the officers had with Baez was necessary to the cell

extraction  in  the  circumstances  the  defendants  faced  and  the  dangerous  threat  they

confronted. Exh. C ¶49.

Baez received a thirty-six month sentence to the DDU for his rioting and assault. The

sanction was imposed because of his lengthy history of assaulting both staff and inmates.

Relevant portions of the Certified Administrative Record are attached as Exh. E.

Attached as Att. No. 1 is a true and accurate photograph of the sharpened weapon that

was tied to Baez's hand, with which he struck Officers McManus, Preston, and Bolduc

during the forced cell extraction at about 11:17 p.m. on June 26, 2002. Exh. A, ¶87. The

weapon had a five- to six-inch blade. Exh. A, ¶88. Various other weapons confiscated from

Baez or thrown out of his cell before the move are shown in attachment 2 to Exhibit A.

## **Argument**

Summary judgment is appropriate against a party who "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at   trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A non-moving party cannot rest on mere allegations  but must adduce specific, provable facts that establish that there is a triable issue. Rogers v. Fair, 902 F.2d 130, 143 (1st Cir. 1990).  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex , 477 U.S. at 317 (quoting Fed. R. Civ. P. 56(c)).

**A.**    **The Defendants Are Entitled to Judgment Because the Uncontested Facts and Admissions Establish That Baez Will be Unable to Prove that They Used Any Unconstitutionally Malicious and Sadistic Force in Defending Themselves and Others from Baez's Deadly Armed Attack, Stripping and Searching Him, and Restraining Him.**

Baez cannot rest on his unverified Complaint to rebut the defendants' affidavits and his own Admissions. "[I]n the face of the defendant's properly supported motion for summary judgment, the plaintiff [can]not rest on his allegations ... to get to a jury without 'any significant probative evidence tending to support the complaint.' "Anderson v. Liberty Lobby, Inc. 477 U.S. at 249 quoting First Nat'l Bank of Ariz. v. Cities Serv. Inc., 391 U.S. 253 (1968).    In addition, there must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

The applicable constitutional provision in the present case the Eighth Amendment's prohibition of cruel and unusual punishment, since Baez was a state prisoner serving a criminal sentence. A use of force is cruel and unusual punishment when it is inflicted

18

sadistically and maliciously and with the intent to cause unnecessary pain or injury.

<u>Whitley v. Albers</u>, 475 U.S. 316 (1986). In order to prove a violation under the Eighth

Amendment based on a claim of excessive force, the plaintiff must prove <u>each</u> of the

following five elements by a preponderance of the evidence:

  <u>First</u>; that defendants were acting under color of state law;

  <u>Second</u>; that one or more defendants used force;

  <u>Third</u>, that one or more defendants used force that was unnecessary or excessive;

  <u>Fourth</u>; that one or more defendants used force maliciously and sadistically, for the

sole purpose of causing harm; and

  <u>Fifth</u>; that the plaintiff did, in fact, suffer some objectively measurable harm as a

result of the use of force. <u>Hudson v. MacMillan</u> , 501 U.S. 1, 5 (1992); <u>Whitley v. Albers</u>,

475 U.S. 316 (1986).

  The defendants did not contest the first two elements. The third element requires that

the Court determine whether the use of force was unnecessary or the amount of force that

the defendant used was excessive. To make a determination as to the reasonableness of a

correction officer's decision to use force and the amount of force used, the Court must take

into account the circumstances in which the force was used. Factors the Court should

consider include the threat posed by the inmate. <u>Sacramento v. Lewis</u>, 523 U.S. at 853.

  In the present case, Baez admits that he was armed with a deadly weapon, that he

attacked the extraction team officers with it, and he struggled with the officers' attempts to

disarm him and place him in restraints. The uncontroverted evidence is that Baez, having

19

expressed his intent to "not go down without   a fight," but to take it to the end, and having

laid a "trap" and armed himself with a deadly weapon, clearly intended to inflict mortal

injury on as many correction officers as he could. He will therefore be unable to offer any

evidence at trial to prove that the defendants' use of force on him was out of proportion to

the threat he posed and the security needs of the prison, that the amount of force was

malicious and sadistic and intended for the sole purpose of causing him unnecessary pain

and injury. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See Hudson v. McMillan,

503 U.S. 1, 6 (1993).

Baez will also be unable to produce evidence at trial to prove the fourth element of

an Eighth Amendment violation, a wanton and malicious infliction of pain. Among the "

'unnecessary and wanton' inflictions of pain [constituting cruel and unusual punishment

forbidden by the Amendment] are those that are 'totally without penological justification.' "

Rhodes v. Chapman, 452 U.S. 337, 346 (1981). This determination is made in the context of

prison conditions by ascertaining whether an official acted with "deliberate indifference" to

the inmates' health or safety, Hudson v. McMillian, 503 U.S. 1, 8 (1992), a state of mind that

can be inferred from the fact that the risk of harm is obvious, Farmer v. Brennan, 511 U.S.

825 ( 1994).

The circumstances faced by the officers who had physical contact with Baez are not

unlike those faced by the defendants in Whitley v. Albers,  475 U.S. 312 (1986).  In

Whitley, the Supreme Court wrote that "in making and carrying out decisions involving the

use of force to restore order in the face of a prison disturbance, prison officials must take

into account the very real threats the unrest presents to inmates and prison officials alike, in

20

addition to the possible harms to inmates against whom force might be used." Whitley, 475 U.S. at 320. There the prison officials used deadly force, shooting an inmate who appeared to be attempting to interfere in officials' attempts to rescue a hostage in a prison disturbance. The Court ruled that the ultimate question is whether the measure that the prison officials took inflicted unnecessary and wanton pain and that this determination "turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21. The factors to be considered are the need for the application of the force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted. Id. The Whitley Court, in upholding a directed verdict for the prison officials, set forth the standard that "[u]less it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard ….described, the case should not go to the jury." Whitley, 475 U.S. at 322.

The uncontroverted evidence in the present case is that Baez was a dangerously armed inmate, who was threatening that he intended to trap and harm any correction officers who entered his cell to extract him. He would kill any canine used to obtain his compliance. When ordered to uncover his window and to come to the door to be cuffed without force, Baez attacked officers through the food slot with deadly weapons. He used the time given to him to calm down and submit to further arm himself, tying a deadly weapon to his wrist to prevent his being disarmed, setting more trip ropes to trap entering officers, and lying in wait at a vantage point above their heads. He struck officers one by one as they entered his

21

cell and as they lay tangled in the trip ropes   trying to deflect his blows and to subdue him.  Baez was brought to the floor from the top of his bed, only after the third officer entering his cell applied increased force to him.  Baez continued to struggle and strike the officers with his weapon. There is no evidence that the defendants were the cause of intentional malicious injuries or pain to Baez.

The uncontroverted evidence is that all of the force applied to Baez was intended by the officers only as defense of self and others in the face of grave bodily injury, as a legitimate means of subduing Baez, preventing his escape from his cell where there existed a likely possibility of him killing an unprotected staff member or taking a hostage,  disarming him,  cutting away the trip wires and body and wrist wraps Baez had tied around the cell and himself, applying restraints while he continued to struggle to lay blows on the officers, carrying him from the cell, strip searching him for more concealed weapons, and restraining him while he received a medical check. The evidence is uncontroverted that Baez clearly intended mortal harm to any officer he came into contact with, and that the threat he posed did not end when he was handcuffed. Baez was double jointed and could have slipped his restraints at any time, and had a history of concealing weapons. Admissions, Nos. 2 and 3.

Besides the need for the application of force, the lack of evidence of any malicious injury, and the threat reasonably perceived by the responsible officials; Court should also consider the defendants' efforts to temper the severity of a forceful response. The evidence is uncontroverted that the extraction team used every available means to obtain Baez's cooperation before resorting to the use of physical force.  He was given access to the Mental Health Director as an impartial observer, he was given many opportunities to be cuffed and

removed peaceably, up to the instant before   the locksmith unlatched his cell door.   To this point, had Baez indicated that he would comply by coming to the door and being cuffed, the use of physical force would have been unnecessary. Baez admits, however, that he refused every verbal order, kept his window covered, would have killed the dog, rigged a trap for officers, leaped on them from above and tried to stab them, and at every step struggled against their authorized efforts to subdue him, apply restraints and search him. Baez also admits that he fell to the floor hitting his head during his attack on the officers. The evidence establishes that Baez tried to use deadly force on as many officers as he could. At no time, however, did the officers use deadly force on Baez in response. There is no evidence that the defendants inflicted any injury on Baez, that they inflicted any injury or blows with a malicious and sadistic intent.

Prison officials such as correction officers, have the duty to restore order and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance. Even if a prison official's evaluation of the incident is significantly different than the Court's, their view is entitled to prevail so long as it is honestly held and within rational boundaries. In assessing whether the belief is honestly held, the Court must recognize that prison officials draw upon an experience peculiar to the institutions they control, and the inmates within. Gomes v. Fair, 738 F.2d 517, 525 (1st Cir. 1984). In addition, some leeway must be afforded to law enforcement officers who make instant decisions in dangerous situations. The reasonableness of the force used must be assessed in

23

light of this need to act quickly and decisively and not with the perspective of one who has time to pause and reflect on the matter. <u>Saucier v. Katz</u>, 533 U.S. 194, 121 S.Ct. 2151, 2158 (2001).

As a matter of law, considering the uncontested evidence of the deadly threat that Baez posed throughout, and considering that the level of force used on him was less than deadly force, which Baez admits he used against the defendants, and the lack of contest evidence supporting Baez's bald allegations, the Court should rule in favor of the defendants.

> **B.    Former Superintendent Ficco is Entitled to Judgment Because Baez Has Made No Allegation of, and Cannot Submit Evidence of Any Personal Involvement.**

An individual may not be held liable for a civil rights violation that was not personally caused by him. As a matter of law, a supervisor may not be held liable for the civil rights violations of his subordinates unless the supervisor himself ordered or participated in the violations, or failed to take reasonable steps to stop the violations, and even then, only if he had actual knowledge of the alleged violation. <u>Rizzo v. Goode</u>, 423 U.S. 362, 367-377 (1976); <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978). <u>Clancy v. McCabe</u>, 441 Mass. 311, 320, n. 13 (2004). "Such delegation was not unreasonable and provides insufficient evidence on which to rest a determination of deliberate indifference." <u>Clancy v. McCabe</u>, <u>supra</u>. "It is unrealistic to expect supervisors to reinvent the wheel on every action taken by their predecessors or subordinates. . . . For bureaucratic structures (or any other form of social organization) to function, the ability to delegate responsibility and to trust the judgments of others is

essential." Clancy v. McCabe, 441 Mass. At  320, n. 13 quoting from Camilo-Robles  v.

Zapata, 175 F.3d 41, 46, n. 2 (1st Cir. 1999).

     The uncontested evidence is that Superintendent Ficco did not participate in the use

of force on Baez, and the complaint must be dismissed against him

     **C. In the Alternative, the Defendants Are Entitled to Qualified Immunity for The Exercise of Force on Baez, Since a Reasonable Correction Officer in Their Positions Would Reasonably Have Believed that the Amount of Force Used Was Necessary in the Face of the Threat that Baez Posed, and The Speed in Which They Had to Act to Reduce That Threat.**

     The defense of qualified immunity applies to an excessive use of force claim.

Saucier v. Katz, 534 U.S. 194 (2001). The Supreme Court set forth the criteria:

> The qualified immunity inquiry, …, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Saucier v. Katz, 533 U.S. 194, 205 (2001).

     On a motion for summary judgment brought by a defendant seeking qualified

immunity, the lower court's inquiry is "whether a reasonable official could have believed his

actions were lawful in light of clearly established law and the information the official

possessed at the time of his allegedly unlawful conduct."  Lowinger v. Broderick, 50 F.3d

61, 65 (1st Cir. 1995) (other citations omitted).  Although, as with any summary judgment

determination, all facts and reasonable inferences are construed in favor of the nonmoving

party, the analysis employed to determine whether an official is entitled to qualified

25

immunity is quite generous. <u>Lowinger</u>, 50 F.3d at 65. Courts have held that a "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." <u>Cookish v. Powell</u>, 945 F.2d 441, 443 (1st Cir. 1991); <u>see</u> <u>also</u> <u>Rivera v. Murphy</u>, 979 F.2d 259, 263 (1st Cir. 1992) (the qualified immunity standard gives "ample room for mistaken judgments" by "protecting all but the plainly incompetent or those who knowingly violate the law").

    The only relevant inquiry <u>material</u> to qualified immunity is what the officer knew or believed at the time he acted; not whether the officer's perception was accurate. <u>Lowinger</u>, 50 F.3d at 65. Even if the prison officials evaluation of the incident is significantly different from the court's, their view is entitled to prevail so long as it is honestly held and within rational boundaries. In assessing whether the belief is honestly held, the Court must recognize that prison officials draw upon an experience peculiar to the institutions they control, and the inmates within. <u>Gomes v. Fair</u>, 738 F.2d 517, 525 (1st Cir. 1984).

    Under the substantive analysis set forth in Section A, *infra*, and based on the uncontroverted evidence of their objectively reasonable beliefs, the defendants are entitled to qualified immunity even if the Court determines that they mistakenly perceived the need to use that level of physical force on Baez that they did. The uncotroverted evidence establishes that the level of force they used was based on their reasonable perceptions, held in good faith. Contrast <u>Hope v. Pelzer</u>, 536 U.S. 730, 738 (2002)(" Any safety concerns had long since abated by the time [the prisoner] was handcuffed to the hitching post, because he

26

had already been subdued, handcuffed, placed in leg irons, and transported back to prison. He was separated from his work squad and not given the opportunity to return. Despite the clear lack of emergency, respondents knowingly subjected him to a substantial risk of physical harm, unnecessary pain,…….").

## Conclusion

For the foregoing reasons, the Court should enter summary judgment for the defendants and dismiss the complaint.

<div style="margin-left:40%">

Respectfully submitted,

The defendants,
By their attorneys,

NANCY ANKERS WHITE
Special Assistant Attorney General

_/s/Margaret Melville
Margaret Melville
BBO #477970
Department of Correction
Legal Office
70 Franklin Street, Suite 600
Boston, MA 02110
617-727-3300 ext. 149
msmelville@doc.state.ma.us

</div>

Dated: July 12, 2007

*

27

**CERTIFICATE OF SERVICE**

I, Margaret Melville, certify that on this day, I have served the plaintiff *pro* se in the above–entitled action with a true and accurate copy of the foregoing, and Certificate of Service at his addresses of record, by First Class Mail, postage prepaid.

July 12, 2007                                      /s/ Margaret Melville
                                                   Margaret Melville

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS
C.A. No. 05-11045-GAO

MICHAEL BAEZ,
    Plaintiff

    v.

MICHAEL MALONEY, et al.,
    Defendants

### DEFENDANTS' NOTICE OF CONVENTIONAL FILING OF EXHIBITS

    The defendants in the above-captioned action file their notice that they are filing the

Exhibits in support of their Motion for Summary Judgment by conventional filing.

1. Addendum- 103 CMR 505;

2. Exhibit A, <u>Affidavit of Robert Lashua</u>, and four attachments;

3. Exhibit B, <u>Affidavit of Michael Cravedi</u>;

4. Exhibit C, <u>Affidavit of David Bolduc</u>;

5. Exhibit D, <u>Plaintiff's Admissions</u>;

6. Exhibit E, Relevant Portions of Certified Copy of Administrative Record.

                    Respectfully submitted,

                    The defendants,
                    By their attorneys,

Dated: July 12, 2007

                    NANCY ANKERS WHITE
                    Special Assistant Attorney General

                    _/s/<u>Margaret Melville</u>
                    Margaret Melville
                    BBO #477970
                    Department of Correction
                    Legal Office
                    70 Franklin Street, Suite 600
                    Boston, MA 02110
                    617-727-3300 ext. 149
                    msmelville@doc.state.ma.us

**CERTIFICATE OF SERVICE**

I, Margaret Melville, certify that on this day, I have served the plaintiff *pro* se in the above–
entitled action with a true and accurate copy of the foregoing, and Certificate of Service at
his addresses of record, by First Class Mail, postage prepaid.


July 12, 2007                                /s/ Margaret Melville
                                             Margaret Melville