# ADDENDUM

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**

**103 CMR 505**

**USE OF FORCE**

**TABLE OF CONTENTS**

| | |
|---|---|
| 505.01 | Purpose |
| 505.02 | Statutory Authorization |
| 505.03 | Cancellation |
| 505.04 | Applicability |
| 505.05 | Access to Regulations |
| 505.06 | Definitions |
| 505.07 | Use of Force |
| 505.08 | Prohibitions on the Use of Force |
| 505.09 | Requirements Governing the Use of Chemical Agents |
| 505.10 | Requirements Governing the Use of Instruments of Restraint |
| 505.11 | Requirements Governing the Use of K-9 Units |
| 505.12 | Requirements Governing the Use of Firearms |
| 505.13 | Reporting Requirements for the Use of Force |
| 505.14 | Medical Treatment |
| 505.15 | Sanctions for Violations of These Regulations |
| 505.16 | Training in the Use of Force |
| 505.17 | Emergencies |
| 505.18 | Responsible Staff |
| 505.19 | Annual Review |
| 505.20 | Severability Clause |

**505.01**     **Purpose**

These regulations set department policy governing the use of force by employees of the Department of Correction.

**505.02**     **Statutory Authorization**

103 CMR 505 is issued pursuant to M.G.L., c. 124, §1 (b),(c), and (q), and M.G.L. c. 127, § 33.

**505.03**    **Cancellation**

These regulations cancel all previous Department policy statements, bulletins, directives, orders, notices, or regulations on the use of force, to the extent they are inconsistent with these regulations.

**505.04**    **Applicability**

103 CMR 505.00 is applicable to all employees of the Department, provided, however, that 103 CMR 505.10 shall not apply when instruments of restraint are applied to inmates that have been admitted or committed to the Bridgewater State Hospital under the provisions of M.G.L. Ch.123. It shall apply when instruments of restraint are applied to those inmates who have been placed at the Bridgewater State Hospital via the classification process for the purpose of assignment to the permanent inmate workforce. Provided, further, that 103 CMR 505.00 shall not apply to employees of the department when restraints are applied for medical reasons to inmates housed at the Lemuel Shattuck Hospital.

**505.05**    **Access to Regulations**

Copies of 103 CMR 505 shall be posted and maintained in prominent places accessible to all employees and inmates. A copy shall be given to each employee at the time of his/her initial orientation. A copy shall be kept on file in the institutions central policy file, inmate law library, and in the central office policy file.

**505.06**    **Definitions**

Ammunition - The projectile(s), along with the casing and primer that can be fired from a firearm.

Business Hours - Monday through Friday, 9:00 a.m. to 5:00 p.m. excluding holidays.

Chemical Agents - Any device or instrument which contains or emits a liquid, powder, or any other substance designed to incapacitate. This includes, but is not limited to, tear gas cartridges and self-contained sprays.

Commissioner – The Commissioner of the Department of Correction.

Department – The Department of Correction.

Deputy Commissioner – The Deputy Commissioner of the Department of Correction. In the absence of the Commissioner, the Deputy Commissioner shall act as the Commissioner.

Department Duty Officer Station – Designated site that assist the processing of information for Duty Officer System.

Department Investigations/Apprehension Unit – The unit of the Department of Correction that conducts investigations at the direction of the Commissioner, and is responsible for the apprehension of escaped inmates.

Director, Special Operations Division – The Department staff person responsible for the daily operations of the Special Operations Division of the Department of Correction.

Director, Health Services – The staff person charged with the administration of the Health Services Division of the Department of Correction.

Emergency – Any situation where the failure of an individual to take immediate action would place himself/herself or another at imminent risk of death or serious bodily injury.

Employee – An employee of the Department of Correction. Employee shall also refer to individuals paid for services performed within a correctional institution for or through a contracted service or agency.

Excessive Force – Force which exceeds reasonable force, or force which was reasonable at the time its use began but was used beyond the need for its application.

Firearm – A pistol, revolver, or other weapon of any description, loaded or unloaded, from which ammunition can be fired.

Force - The use of physical power.  The use of a weapon, a chemical agent or instrument of restraint to compel, restrain, or otherwise subdue a person.

Four-Point Restraint - Any combination of instruments of restraint such that four limbs of an inmate are restrained at any one time, in any manner to a fixed object.

Institution Duty Officer - The staff person assigned the duties as institution duty officer by the Superintendent. He/she may be the Superintendent's designee.

Instruments of Restraint - Equipment authorized for use during the  transportation of inmates to prevent escape, or to prevent injury to self, others or property. Instruments of restraint shall include, but not be limited to: handcuffs, waist chains, leg restraints, towels, security restraint chair, soft posey restraints, flexible restraints or any other device or equipment authorized by the Commissioner.

K-9 Unit - A K-9 handler and dog.

Medical Director - Senior level Clinical Physician Provider.

Reasonable Force - The force that an objective, trained and competent correctional employee, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.

Serious Bodily Injury - Any injury which creates a substantial risk of death or any injury which is likely to cause serious permanent disfigurement, or the loss or extended impairment of any limb, organ or other part of the body.

Shift Commander - The staff member who is responsible for the security of the institution, the care and custody of all inmates housed in the institution, and the supervision of all security staff during a given tour of duty.  May be responsible for institutional operations during the absence of higher ranking staff.

<u>Special Unit Director</u> - The administrative head of the following units:

- The Department Investigations/Apprehension Unit;
- The Department Staff Development Division;
- The Department Central Transportation Unit; and
- The Special Operations Division.

<u>Superintendent</u> - The chief administrative officer of a Department of Correction institution.

<u>Visitor (Inmate)</u> - Any person requesting entrance into a correctional institution's visiting room or other approved visiting area for the sole purpose of conducting a social visit with an inmate incarcerated within any state correctional institution.

<u>Visitor (Institutional)</u> - Any person requesting entrance into a correctional institution to conduct official business such as, but not limited to: contractors; vendors; repairmen; facility tours; media; volunteers; and, persons wishing to provide services to inmates or to examine or report on inmates conditions.

## 505.07    **Use of Force**

(1)    Before the use of force upon an inmate, an employee when time and circumstances permit, should issue a verbal warning to the inmate to stop or otherwise desist and obey the order of the employee.

(2)    An employee may use reasonable force when it is necessary to:

(a)    prevent the commission of a felony, including escape;

(b)    prevent an act which could result in death or serious bodily injury to himself/herself or another person;

(c)    defend himself/herself or another against a physical assault;

(d)  prevent serious damage to property;

(e)  prevent or control a riot or disturbance;

(f)  move an inmate who has refused a proper order by an employee;

(g)  apprehend an escaped inmate;

(h)  conduct the search of an inmate who has refused a proper order by an employee to submit to said search;

(i)  preserve the overall order and security of the institution; and

(j)  preserve the safety of any employee, inmate, or visitor.

## 505.08    Prohibitions on the Use of Force

(1)  An employee shall not use or permit the use of excessive force.

(2)  An employee shall not use or permit the use of force as punishment or discipline.

## 505.09    Requirements Governing the Use of Chemical Agents

(1)  Only those chemical agents approved in writing by the commissioner are authorized for use.

(2)  Chemical agents may not be used in state institutions without the prior authorization of the superintendent, or in the absence of the superintendent a designee.  All such authorizations shall be documented in writing after the incident and within the time limits of 103 CMR 505.13 (1).

(3)  Prior to the use of chemical agents, the medical director or designee, shall review the inmate's medical file to determine any medical issues that would constitute a contraindication for the use of chemical agents. The review shall be documented on the "Use of Chemical

Agents" form (Attachment A) and signed by the medical director or designee. Inmates in adjacent cells shall also be checked for contraindications. If necessary, the inmate(s) shall be moved to a non-affected area prior to chemical agents being used unless an emergency exists requiring the immediate use of chemical agents.

(4) Chemical agents shall not be used as punishment.

(5) Chemical agents shall only be used by employees trained in their proper use.

(6) Chemical agents shall only be used following the manufacturer's recommendations and in compliance with the training program plan as approved by the commissioner.

(7) Decontamination of contaminated areas(s) shall be in accordance with the manufacturer's recommendations and in compliance with the training program plan as approved by the commissioner.

(8) The use of chemical agents shall be considered a use of force. The reporting requirements of 103 CMR 505.13 shall be followed.

(9) Following the application of chemical agents, the appropriate assistant deputy commissioner shall be notified.

**505.10    Requirements Governing the Use of Instruments of Restraint**

(1) Only instruments of restraint approved by the commissioner and issued by the Department shall be used. Gags are not authorized as instruments of restraint and their use is a violation of 103 CMR 505.00.

(2) Instruments of restraint shall not be used as punishment.

(3) Instruments of restraint used to prevent escape during the transportation of inmates shall not be considered to be a use of force.

(4) Instruments of restraint used during the routine movement of inmates from one point to another within a

7/23/99                                            505 - 7

correctional institution shall not be considered a use of force.

(5) Except as described in 103 CMR 505.10 (3) and (4), instruments of restraint shall only be used when all other reasonable methods of control have been considered and deemed inappropriate, and then only on the documented approval of the superintendent or, in the absence of the superintendent a designee. The shift commander may authorize the use of instruments of restraint for up to two hours. The shift commander shall be required to notify the superintendent, or in the absence of the superintendent a designee, by normally accepted means of communication as soon as possible to gain his/her documented approval for continued use of instruments of restraint beyond two hours. The duty station shall also be notified.

(6) Instruments of restraint shall only be used by employees trained in their proper use. Such training shall be documented.

(7) Instruments of restraint used for purposes other than as described in 103 CMR 505.10 (3) and (4), shall only be used until the restrained inmate has exhibited through his/her actions or statements that he will not resume the conduct which resulted in the decision to use instruments of restraint. In no event shall an inmate be restrained beyond an eight hour period without the documented review on attachment E by a member of the mental health staff. Such a review will occur at the end of each eight hour period. The superintendent shall notify the assistant deputy commissioner as soon as possible if an inmate is to be restrained longer than eight hours.

(8) All restrained inmates, except those restrained under 103 CMR 505.10 (3) and (4), shall be examined by a member of the institution's medical staff at regular and frequent intervals. Except in unusual circumstances, intervals shall not be greater than two hours in duration. Any examination pursuant to this section shall be documented.

(9) Any inmate restrained to prevent self-mutilation shall be examined by a member of the medical and mental health staff as soon as possible using established protocols.

7/23/99

The director of health services, or designee, shall be notified by normally accepted means of communication within two hours of placing the inmate in restraint, of the results of the examination conducted under the provisions of this section.

(10) At no time shall an inmate under restraint be out of the visual observation of staff.

(11) The application of instruments of restraint shall be such that they provide the least amount of physical restraint necessary for the situation. This may include the use of handcuffs, waist chain or leg restraints, separately or in combination.

(12) At no time shall handcuffs or waist chains be connected together with leg restraints.

(13) If four-point restraints are authorized by the superintendent, or his/her designee, or the shift commander as allowed by 505.10 (5), the assistant deputy commissioner shall be notified immediately. In those instances where the use of four-point restraints have been ordered as medically necessary by a member of the medical or mental health staff, the director of mental health services, or designee, shall be notified during business hours. The department duty station shall also be notified. Such notifications shall be made within two hours of an inmate being placed in four-point restraints, be documented, and shall include but not be limited to:

    (a) inmate's name and commitment number;

    (b) reason for placing the inmate in four-point restraint;

    (c) time placed in restraints;

    (d) what other actions were taken or considered before placing the inmate in four-point restraints;

    (e) if four-point restraints are being used in cases involving self-mutilation or attempted self-mutilation, the expected time of examination by mental health staff;

     (f)  expected time of release from four-point restraints.

(14)  The use of instruments of restraint except when used as described in 103 CMR 505.10 (3) and (4), is a use of force and the reporting requirements of 103 CMR 505.13 shall be adhered to.

**505.11    Requirements Governing the Use of K-9 Unit ~~Teams~~**

(1)  Only those K-9 units approved by the commissioner shall be used within any correctional institution.

(2)  K-9 units may not be used in state correctional institutions without prior authorization of the commissioner or his/her designee, unless an emergency exists requiring their immediate use. Authorization is not required for regular routine searches or patrol within or outside of an institution, during which, under normal circumstances there is limited contact with inmates and injuries would not normally result.

(3)  Anyone who is injured as a result of actions by a K-9 unit shall be seen by medical staff as soon as possible. Such medical care shall be documented.

(4)  It shall be the responsibility of the K-9 handler to make a full report of all incidents involving the use of the K-9 unit, except regular routine searches or patrols within or outside of an institution, during which, under normal circumstances there is limited contact with inmates and injuries would not normally result.  If contact with an inmate(s) occurs or injuries result from the use of the K-9, the names of such persons(s) injured or having contact shall appear in the report, which shall be submitted to the superintendent as soon as possible, but in any event before the end of the K-9 unit's shift, unless otherwise authorized by the superintendent.

(5)  The use of K-9 units, except as provided in 103 CMR 505.11 (4), shall be considered a use of force.  The reporting requirements of 103 CMR 505.13 shall be adhered to.

**505.12    Requirements Governing the Use of Firearms**

(1)    An employee may use a firearm only as a last resort when all other means have been attempted or it is reasonable to believe that they would be ineffective, and only in the following situations:

    (a)    To prevent an act which is likely to create an imminent risk of death or serious bodily injury to the employee or another person.

    (b)    To prevent an escape of an inmate whom the employee reasonably believes to be a convicted felon and the use of force does not pose a risk of harm to innocent persons.

    (c)    To carry out the arrest of an escaped inmate on a charge of escape as defined by M.G.L. c. 268, s. 16, but only if:

        (1)    the employee holds a valid special state police commission pursuant to M.G.L. 127, s. 127;

        (2)    the employee reasonably believes that the use of firearms creates no substantial risk of injury to innocent persons; and

        (3)    the employee reasonably believes that:

            (a)    the inmate's escape involved the use or threatened use of force which is/was likely to create an imminent risk of death or serious bodily injury to the employee or another person, or;

            (b)    there is substantial risk that the escaped inmate will cause death or serious bodily injury if the apprehension is delayed.

(2)    Firearms shall not be used without the prior authorization of the commissioner, or a designee; the superintendent, or a designee; the special unit director, or a designee; unless an emergency exists requiring the immediate use of firearms.

(3)    There may be rare situations where an employee will have to use a firearm without prior authorization. Any such

use of a firearm will be strictly reviewed to determine:

(a)  It was not possible to get timely authorization, and;

(b)  It was reasonable for the employee to believe that an emergency existed requiring the immediate use of a firearm to prevent death, serious bodily injury or escape of a convicted felon as described in 103 CMR 505 12 (1) (B).

(4)  Anyone who is injured as a result of the discharge of a firearm shall receive immediate medical care.  Such care shall be documented.

(5)  Except in emergency situations, firearms are prohibited in minimum and pre-release institutions. Firearms shall not be used to prevent escapes from minimum or pre-release institutions. Nor shall firearms be used to prevent escapes of individuals recognized and known to be a civil commitment to the Bridgewater State Hospital, the Treatment Center at the Bridgewater Complex, the Addiction Center at Southeastern Correctional Center, or detainees committed to MCI-Framingham under pre-trial or civil commitment status, except when necessary to prevent an act which is likely to create an imminent risk of death or serious bodily injury to the employee or another person.

## 505.13    Reporting Requirements for the Use of Force

(1)  After an employee uses force, the superintendent, or a designee, or the special unit director, or a designee shall be notified immediately. In addition, the employee as soon as possible, and in no event later than the end of the employee's tour of duty, unless otherwise authorized by the superintendent or special unit director, shall submit a written report to the superintendent, or the special unit director.

The report shall include:

(a)  An accounting of the events leading up to the use of force;

(b)  A precise description of the incident and the reasons for employing force;

     (c)   A description of the type of force used, and how it as used;

     (d)   A description of the injuries suffered, if any, and the treatment given, if known, along with attached photographs, if any; and

     (e)   A list of all participants and witnesses to the incident.

(2)   The superintendent or special unit director shall also require a written report containing matters listed in subsection (1) above, from any employee who witnessed the use of force.

(3)   A copy of the report described in 103 CMR 505.13 (1), and a completed form 505-1 shall be submitted to the director of the special operations division, by the superintendent or special unit director within ten working days from the time of the incident.  In the event additional time is required, the superintendent or special unit director shall seek written approval from the commissioner.  The request to the commissioner for additional time shall state the reason(s) for the delay and the expected time of completion.  The director of the special operations division shall review the reports and may request additional information or may recommend to the commissioner that an investigation be conducted by the department investigations unit.

(4)   Whenever the death of an inmate occurs as a result of a use of force, the superintendent or special unit director shall immediately notify the commissioner through the fastest means, and the District Attorney's Office responsible for the institution or location where the death occurred.

(5)   All use of force incidents shall be investigated and analyzed.  The investigation shall include a review by the superintendent or designee of the following: video/audio tapes, and the completed use of force package. Any inappropriate action discovered during this investigation shall be reported to the respective assistant deputy commissioner.

(6)   The director of special operations shall conduct an analysis of all uses of force, which occur within the

department of correction.  Each quarter the Director of
Special Operations shall submit his/her written findings
to the commissioner.

**505.14     Medical Treatment**

(1)  Any inmate involved in a use of force shall be examined
by medical staff as soon as possible. This examination
and any treatment performed shall be documented.

(2)  Any person injured during a use of force shall be
examined as soon as possible by a medical staff member.
Such care or treatment shall be documented.

(3)  Any inmate refusals of medical examinations or treatment
shall be made directly to medical staff and documented by
medical staff.

**505.15     Sanctions for Violation of 103 CMR 505.00**

Any employee who violates or permits the violation of
these regulations or who fails to report any violation or
suspected violation of these regulations shall be subject
to disciplinary action up to and including termination.

**505.16     Training in the Use of Force**

All employees charged with the care and custody of
inmates shall be trained in approved methods of using
physical force, instruments of restraint, chemical agents
and firearms to control inmates where necessary.  Such
training shall be documented in the employee's permanent
training file.

**505.17     Emergencies**

Whenever in the opinion of the commissioner or his
designee, an emergency exists which requires suspension
of all or part of the 103 CMR 505.00, he/she may order
such suspension.

**505.18     Responsible Staff**

The director of the special operations division shall be
responsible for implementing 103 CMR 505.00 throughout

the department.  Each superintendent and special unit
director shall be responsible for implementing and
monitoring these regulations within the institution or
unit, and for the development of necessary and
appropriate procedures as required which shall be
reviewed and signed-off by the reviewing authority.

**505.19**    **Review Date**

103 CMR 505.00 shall be reviewed annually from the
effective date by the commissioner or a designee. The
party or parties conducting the review shall submit a
memorandum indicating that the review has been completed.
A copy of this memorandum shall be filed in the central
policy file of the Department of Correction.
Recommendations for revisions, additions, or deletions
shall be included.

**505.20**    **Severability Clause**

If any article, section, subsection, sentence, clause or
phrase of these regulations is for any reason held to be
unconstitutional, contrary to statute, in excess of the
authority of the commissioner, or otherwise inoperative,
such decision shall not affect the validity of any other
article, section, subsection, sentence, clause or phrase
of 103 CMR 505.00

**REGULATORY AUTHORITY**
    **103 CMR 505.00 M.G.L. c. 124, ss. 1(b), (c), and (q); c. 127,
s. 33.**

| FORM 505-1<br>February 2002 | DEPARTMENT OF CORRECTION<br>USE OF FORCE<br>REPORTING FORM | FOR OFFICIAL USE ONLY<br>SPECIAL OPERATIONS CASE<br>NUMBER |
|---|---|---|

Date of Incident _____Time of Incident_____ AM/PM Report Date_____

Institution/Unit _____Incident Location_____

Inmate Name _____ ID: _____

Race:  White_____      Black_____    Hispanic_____    American Indian_____    Other_____

Location of Use of Force: Gen.Pop. _____ SMU _____ HSU _____ ISO ___Mental Health _____

Use of Force Was Spontaneous: _____    Use of Force Was Planned: _____
Assaultive:____   Disoriented:_____   Self Destructive: _____   Threatening: _____
Destroying Property:___ Staff Assaulted:____Refusal to obey orders of staff:____other:____

Video Was Utilized:_____Surveillance Video:_____Extraction Team Video:_____ No Video Available:_____

Reason no Video Available : Camera Malfunction:_____  Video Tape Malfunction:_____
Battery failure:_____   Other:_____

Inmate Warned of Use of Force: yes___no___Warned to Stop Actions: yes___no___
Warned of Possible use of Chemical Agents: Yes___no___

Witnesses to Use of Force: _____   _____   _____

                           _____   _____   _____

**List the names of employees who applied or assisted in the application of Restraints,
and the date they were trained.**

**Name**                          **Title**                          **Date Trained**

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

<u>**CHEMICAL AGENTS:**</u>

Chemical Agents Utilized: yes_____no_____Authorized by: _____

Dispensed By: _____ Certification Date: _____

7/23/99                                                 505 - 16

**RESTRAINTS UTILIZED:**

Cuffs:____    Leg Irons:____    Waist Chains:_____    None:____

**Time Restraints Applied:_____    Time Restraints Removed: _____    Total Hrs.: _____Min ____**

**4 POINT RESTRAINTS UTILIZED:**

4 Point Soft Posey Restraints: ____    4 Point metal Restraints:_____ Security Restraint Chair:____

Restraints Approved By: _____ Restraints Applied By:_____
Security Restraint Chair requires respective ADC approval: ADC Name:_____
Assisting Staff: _____, _____, _____

**Time Restraints Applied:_____    Time Restraints Removed: _____    Total Hrs.: _____Min ____**

Were Restraints Applied longer than two Hours: yes____no____
Superintendent's approval: yes_____no_____

Were Restraints Applied Longer than Eight Hours: yes___no____
Mental Health Staff review: yes_____no_____Attachment E completed: yes___no__

**(More than Eight Hours the Superintendent must Notify Appropriate Assistant Deputy Commissioner)**
Notified by: _____  Time of notification:_____

Use of Chemical Agents: yes_____no_____Complete Attachment ( A )

Any Reason Inmate could not be 4 Pointed: yes_____no_____Complete Attachment ( B )

Four Point Restraint Checks: yes_____no_____Complete Attachment ( C )

EyeBall Watch: yes_____no_____Complete Attachment ( D )

Was Inmate Examined by Medical Staff Every Two Hours: yes___no____

Restraints Applied to Prevent Self Mutilation: yes__no__Mental Health Staff Notified: yes__no__

**K9**
Was K-9 Introduced into Facility: yes_____no_____ Authorized by:_____
Commissioner Notified at:_____  Notified by:_____
Handler:_____  Trained: yes_____no_____

**FIREARMS**

Were firearms Utilized:yes___no____ Authorized By:_____

Persons using Firearms:_____ Qualification Date:_____

_____ Qualification Date:_____

_____ Qualification Date:_____

**Medical Examination**

Staff Injury: yes__no__Staff Treated: yes__no___Refused Treatment: yes__no__Time/date:_____

Inmate Injury: yes___no__Inmate Treated: yes__no__Refused Treatment: yes___no__Time/date_____

REPORT PREPARED BY_____ DATE_____

REPORT REVIEWED BY_____ DATE_____

7/23/99                                                        505 - 17

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
STANDARD OPERATING PROCEDURES
ATTACHMENT TO 103 CMR 505, USE OF FORCE
USE OF RESTRAINTS

**PURPOSE:** Establish standard operating guidelines for the use of restraints in all Department of Correction facilities.

**APPLICABILITY:** This Attachment to 103 CMR 505.00, Use of Force, is applicable to all employees of the department, provided, however, that Sections VI Special Restraints and III A Management of Disruptive/Combative Inmates shall not apply to those inmates who have been admitted or committed to the Bridgewater State Hospital under the provisions of M.G.L. Ch.123. It shall apply to those inmates who have been placed at the Bridgewater State Hospital via the classification process for the purpose of assignment to the permanent inmate workforce.

**I.    USE OF RESTRAINTS FOR TRANSPORTATION**

    A.   All inmates transported out of a facility or from one facility to another will be restrained and transported in accordance with all the guidelines set forth in 103 DOC 530, Inmate Transportation.

**II.   USE OF RESTRAINTS FOR OUTSIDE HOSPITAL DETAILS**

    A.   All inmates that require admittance to an outside hospital shall be restrained in accordance with all the guidelines set forth in 103 DOC 521, Outside Hospital Security Procedures.

**III. MANAGEMENT OF DISRUPTIVE/COMBATIVE INMATES**

    A.   Inmates shall be restrained when they have been determined to be a danger to themselves, other inmates or staff.  The following methods of restraint shall be utilized, with selection to be based upon that which is most appropriate to the circumstances.

        1.   All inmates requiring restraint shall routinely be handcuffed behind the back.

7/23/99                                                                505 - 18

      a.   All restraints shall be applied and removed in the presence of a minimum of two officers to ensure safety.

2.   If circumstances exist where the inmate becomes violent and the sole use of handcuffs cannot ensure officer safety extra restraints may be utilized to include:

      a.   Waist chains; and
      b.   Leg irons.

3.   Once restrained, the inmate shall be moved under a hands-on escort by two staff members.

4.   Inmates placed in restraints as a result of a use of force shall be examined by medical personnel as soon as possible.

5.   If, when removed from population, it becomes necessary to secure the inmate in a temporary holding cell the inmate will remain in restraints under constant visual observation (eyeball) by staff.  The continued use of restraints for temporarily holding an inmate shall not exceed two hours unless approved by the superintendent.

6.   Upon placement of an inmate in a special management unit cell, all restraints shall immediately be removed.  The shift commander can authorize the inmate to remain restrained if the inmate's behavior continues to be violent or is deemed a risk to staff, others, or property. Constant visual observation (eyeball) by staff is required if the inmate is to remain restrained in the cell. The continued use of restraints shall not exceed two hours, unless specifically approved by the superintendent.

7.   If during the two hours the inmates behavior has not improved the superintendent shall be notified and the progression to a more restrictive restraint shall be considered in this order:

7/23/99

    a.   4-point soft posey restraints
    b.   4-point metal restraints
    c.   security restraint chair

Prior to placing an inmate in the security restraint chair, the superintendent will contact the respective assistant deputy commissioner for approval.

B.   To prevent the potential for positional asphyxiation the following guidelines have been established to prevent in-custody deaths due to restraining an inmate:

1.   If as a result of a use of force it becomes necessary to restrain an inmate to the ground, bed, floor etc., the inmate, once handcuffed, shall, as soon as possible, be placed on his/her side or be placed in a sitting position. The inmate shall never be kept face down on his/her stomach.

2.   If an inmate continues to struggle once restrained staff shall never sit on or put their weight down on an inmate's back. The use of leg irons and/or the holding down of the legs shall be utilized.

3.   Staff at no time shall connect handcuffs to leg restraints.

4.   Inmates shall never be transported face down on their stomach (i.e., while using a stretcher, gurney, backboard or vehicle).

5.   Staff shall always maintain observation of a restrained inmate to recognize breathing difficulties or loss of consciousness. Staff shall be alert to issues such as obesity, alcohol and drug use, or psychotic behavior.

**IV.  ROUTINE USE OF RESTRAINTS IN SEGREGATION UNITS**

A.   Movement Inside The Unit

1.   Whenever an inmate is to be removed from his/her cell for routine movement inside a segregation unit the inmate shall be handcuffed behind the back.

7/23/99                                                                       505 - 20

2.  The inmate shall be handcuffed prior to opening the door and shall be moved under a hands-on escort by two staff members.

B.  Movement Outside The Unit

1.  Whenever an inmate is to be moved outside the unit the inmate shall be handcuffed behind the back and placed in leg irons.

2.  The inmate shall be handcuffed and placed in leg irons prior to the cell door opening. Those facilities where leg irons cannot be logistically placed on an inmate prior to the cell door opening shall ensure that handcuffs are applied prior to opening the door. The leg irons shall then be applied inside the room.

3.  Routinely all movement of inmates outside the segregation unit shall be under a hands on escort by two staff members. Exceptions, as approved by the superintendent, may be made when moving inmates to areas such as the law library, etc. under these circumstances the number of inmates moved shall be kept to a minimum. The group shall be escorted by a minimum of two staff members who shall position themselves behind the inmates when moving to the area.

C.  Movement For Recreation

1.  All segregation inmates shall be moved to the recreation area handcuffed behind the back under a hands on escort by two staff members.

2.  Once secured in the recreation area the restraints shall be removed.

V.  **EXTRA RESTRAINT STATUS FOR POTENTIALLY VIOLENT/ASSAULTIVE SEGREGATION INMATES**

A.  In the event an inmate is deemed a risk to the unit and/or staff due to the inmate's behavior extra restraints may be authorized by the superintendent or designee.

7/23/99                                                                    505 - 21

B.   Any movement outside of the cell by an inmate placed on extra restraint status shall be in waist chains and leg irons.

C.   An inmates on extra restraint status shall exercise alone and remain in restraints for the entire exercise period.

D.   The status of any inmate placed on extra restraints shall be reviewed every three days by the superintendent or designee for the continued need to utilize extra restraints. Each superintendent shall develop a mechanism to document the approval of extra restraint status and any subsequent reviews thereafter.

## VI.   SPECIAL RESTRAINTS

A.   Requirements Governing the Use of 4-Point Security Restraints, excluding the Security Restraint Chair.

1.   Use of 4-Point Security Restraints:

a.   Four-point restraints shall only be used when other reasonable methods of controlling an inmate's behavior have been exhausted or ruled out due to the level of agitation exhibited by the inmate.  Intermediate steps which may be considered or used prior to 4-point restraints include, but are not limited to, the following:

i.       Removal of state and personal property.

ii.      Placement in a secure cell;

iii.     Intervention by mental health or other staff; and

iv.      Use of restraints other than 4-point such as handcuffs, waist chains or leg irons used separately or in combination.

7/23/99                                                    505 - 22

b.    If, after using or considering and rejecting, the above mentioned intermediate steps, the inmate's behavior continues to escalate, 4-point restraints may be authorized.

c.    For the purpose of this section, 4-point restraint refers to securing the inmate to a bed for the purpose of restricting movement. Ordinarily this should include the use of soft posey restraints, unless the inmate has a documented history of escape from restraints, or an ability to be uncontrolled in soft posey restraints, in which case metal restraints may be used.

    i.    The inmate shall ordinarily be placed in a face up position. The superintendent shall have discretion to remove the mattress if the inmate has a history of destroying mattresses while in 4-point restraints. A blanket, sheet, or clothing appropriate to the temperature shall be provided to the inmate.

    ii.    Leg restraints should be attached to the ankles and the strap should be threaded through the bed to allow only a slight movement of the legs.

    iii.    Security wrist cuffs shall be placed on each wrist. A security strap shall then be threaded through the metal ring on each of the wrist cuffs. The security strap should be threaded through, and secured to, the bed at the inmates side to allow for only slight movement of the arms.

d.    Only the superintendent shall authorize the use of 4-point restraint. However, in situations that require immediate action to prevent destructive behavior or harm to staff

or others, the shift commander may authorize the use of 4-point restraints for up to two (2) hours. If the shift commander authorizes the use of 4-point restraints he/she shall, as soon as possible, seek approval from the superintendent to continue its use. The superintendent shall immediately notify the respective assistant deputy commissioner.

e.    Before placing an inmate in 4-point restraints, advance approval should be obtained from the institutional medical director or the on-call physician for the facility (Attachment B). For the purposes of this procedure, approval shall mean that there are no medical contraindications to placing the inmate in 4-point restraints. If prior approval cannot be obtained and only in cases where destructive behavior will result in the immediate harm to self, staff, others, or property then such approval shall be sought immediately after placing an inmate in restraints.

f.    Four-point restraint shall only be used until the restrained inmate has exhibited to the shift commander, through a review of the observation log, personal observations, inmate actions and/or statements, 4-point restraint is no longer necessary.

g.    An inmate who is placed in 4-point restraints shall be placed in a cell with a bed that is secured to the wall or floor. All unsecured furnishings, and other State or personal property, must be removed.

2.    Use of Chemical Agent

Chemical agents may be used to assist in the use of force to secure an inmate. Chemical agents shall be used in accordance with 103 CMR 505.09. Prior to the use of chemical agents, the medical director or designee shall review the inmate's medical file to determine any medical issues that would constitute

7/23/99

a contraindication for the use of chemical agents. The decision shall be documented on the "Use of Chemical Agents" form (Attachment A) and signed by the medical director or designee. Inmates in adjacent cells will be checked for contraindications. If necessary the inmate(s) shall be moved to a non-affected area prior to chemical agents being used, unless an emergency exists requiring the immediate use of chemical agents.

3.  Medical Review Process

    Upon placement in 4-point restraints, medical personnel shall conduct an examination of the restrained inmate to document and treat, if necessary, any injury and to ensure that restraining equipment is not applied in a manner that is likely to result in an injury, and that there is no medical contradiction in keeping the inmate in restraints. Such exam shall be documented on "Four-Point Restraint Medical Examination Checklist" (Attachment C). After the initial examination, medical personnel shall conduct subsequent examinations at the following intervals: 15 minutes after the initial examination and then every 2 hours after the initial examination until the restraints are removed. The purpose of the examinations is to check that restraints are not causing injuries and to check vital signs and respiration. All examination results shall be documented on the "Four-Point Restraint Medical Examination Checklist" (Attachment C). This medical examination checklist shall be submitted to the shift commander and be included in the Use of Force Report governed by 103 CMR 505.13.

4.  Administrative Review

    a.  The continued use of 4-point restraints shall be reviewed, at least as frequently as every 2 hours by the superintendent or a designee.

    b.  At no time shall an inmate under 4-point

restraints be out of visual observation (eyeball) of staff. Such observation shall be documented on the "Observation Check Sheet" (Attachment D). Notations shall be made at 15 minute intervals, unless otherwise directed, and shall include the inmate's behavior during the designated time period.

All entries are to be entered in ink and signed by observing staff. At the completion of the restraint, the observation sheets shall be forwarded to the Shift Commander and be included in the Use of Force package.

5. Exercise

After 2 hours, and every 2 hours thereafter, an inmate may be allowed to exercise his/her limbs. This will be accomplished by freeing one limb at a time from restraints and for a period of approximately 2 minutes. Exercise will only be granted if the freeing of the limb will not pose a threat of harm to the inmate being restrained or others. Denial of exercise shall be approved by the shift commander, reported to the superintendent, and documented by the reporting officer with the reasons. Exercise shall be documented on the Observation Check Sheet (Attachment D).

6. Feeding

Meals will not be withheld from inmates on 4-point restraints. Whenever practical, inmates in 4 point restraints will receive the same meal as inmates in general population. Feeding will be accomplished during regular scheduled exercise periods when a limb is released. If while attempting to serve an inmate his/her meal he/she is disruptive with their food, the inmate's actions will be interpreted as refusing to eat. An inmate shall be informed of this before he/she is fed. All feeding or refusals to eat will be documented on the C.O. Observation sheet.

7.    Programs

Inmates in 4-point restraints shall not be allowed participation in any programs, including visitation. This does not preclude appropriate psychiatric, psychological, medical intervention, or medication as directed by physician or psychiatrist. It is the Shift Commander's responsibility to assure that proper security is maintained during examinations.

8.    Use of Audio Visual

Whenever possible, video equipment shall be used to assist in documentation of placement in 4-point restraints (to include the security restraint chair), initial and subsequent medical examinations, exercise, feeding, removal (to include the inmate's response to whether he/she will comply with the rules and regulations of the institution) and other significant incidents.

Date and time shall be exhibited on the camcorder screen or shall be announced by the operator at the time the camera is turned on and shut off.

9.    Use of Toilet Facilities

Access to a toilet will be made available at reasonable intervals. Restraining equipment to assure safety of the inmate and staff shall be reviewed and approved by the Shift Commander.

B.    Requirements Governing the Use of the Security Restraint Chair.

1.    The security restraint chair shall be utilized only as a last restraint option. The security restraint chair may be used when other means of restraint are deemed inappropriate.

2.    Inmates shall be placed in the security restraint chair in accordance with the manufacturer's guidelines.

7/23/99

3.  The assistant deputy commissioner is the only person to authorize the use of the security restraint chair. However, in situations that require immediate action to prevent destructive behavior or harm to staff or others, the superintendent, or shift commander during non business hours, may authorize the use of the security restraint chair. If the superintendent or, shift commander during non business hours, authorizes the use of the chair he/she shall, as soon as possible, seek approval from the assistant deputy commissioner through the respective superintendent to continue its use.

4.  Before placing an inmate in the security restraint chair, advance approval should be obtained from the Institutional Medical Director or the on-call physician for the facility (Attachment B). For the purposes of this procedure, approval shall mean that there are no medical contraindications to placing the inmate in the chair. If prior approval cannot be obtained and only in cases where destructive behavior will result in the immediate harm to self, staff, others or property then such approval shall be sought immediately after placing an inmate in restraints.

5.  The chair shall only be used until the restrained inmate has exhibited to the shift commander, through a review of the observation log, personal observations, inmate actions and/or statements, that the chair is no longer necessary.

6.  When the inmate is placed in the security restraint chair the inmate and security restraint chair will be placed in a cell with all unsecured furnishings removed. The security restraint chair shall be secured in a manner to prevent tipping

7.  Inmates placed in the security restraint chair shall also be placed in an authorized helmet to prevent self harm.

8.  Upon placement in the chair, medical personnel shall conduct an examination of the restrained

inmate to document and treat, if necessary, any injury and to ensure that restraining equipment is not applied in a manner that is likely to result in an injury, and that there is no medical contradiction in keeping the inmate in restraints. Such exam shall be documented on "Use of Four Point Restraint Checklist" (Attachment B). After the initial examination, medical personnel shall conduct subsequent examinations at the following intervals: 15 minutes after the initial examination and then every 2 hours after the initial examination until the restraints are removed. The purpose of the examinations is to check that restraints are not causing injuries and to check vital signs and respiration. All examination results shall be documented on the "Four Point Restraint Medical Examination Checklist" (Attachment C). This medical examination checklist shall be submitted to the shift commander and be included in the Use of Force Report governed by 103 CMR 505.13.

9.   The continued use of the chair shall be reviewed, at least every 2 hours by the Superintendent or his/her designee. If use of the chair continues for a period that exceeds 8 hours, the Deputy Commissioner shall be notified, through the appropriate Assistant Deputy Commissioner.

10.  At no time shall an inmate in the chair be out of visual observation (eyeball) of staff. Such observation shall be documented on the "Observation Check Sheet" (Attachment D). Notations shall be made at 15 minute intervals, unless otherwise directed, and shall include the inmate's behavior during the designated time period. All entries are to be entered in ink and signed by observing staff. At the completion of the restraint, the observation sheets shall be forwarded to the Shift Commander and be included in the Use of Force package.

11.  The entire restraint procedure, including the inmate's actions leading up to the use of the security restraint chair, will be videotaped. All significant occurrences thereafter will be

7/23/99                                                    505 - 29

videotaped (e.g., medical checks).

12. After 2 hours and every 2 hours thereafter, an inmate may be allowed to exercise his/her limbs. This will be accomplished by freeing one limb at a time from restraints and for a period of approximately 2 minutes. Exercise will only be granted if the freeing of the limb will not pose a threat of harm to the inmate being restrained or others. Denial of exercise shall be approved by the shift commander, reported to the superintendent, and documented by the reporting officer with reasons. Exercise shall be documented on the observation check sheet (Attachment D).

13. Meals will not be withheld from inmates in the security restraint chair. Whenever practical, inmates in the security restraint chair will receive the same meal as inmates in general population. Feeding will be accomplished during regular scheduled exercise periods when a limb is released. If while attempting to serve an inmate his/her meal and he/she is disruptive with his/her food, the inmate's actions will be interpreted as refusing to eat. An inmate shall be informed of this before he/she is fed. All feeding or refusals to eat will be documented on the observation check sheet (Attachment D).

14. Access to a toilet will be made available at reasonable intervals. Restraining equipment to assure safety of the inmate and staff shall be reviewed and approved by the shift commander.

7/23/99

505 - 30

# EXHIBITS

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-11045-GAO

MICHAEL BAEZ,
    Plaintiff

    v.

MICHAEL MALONEY, et al.,
    Defendants

<u>AFFIDAVIT OF ROBERT LASHUA</u>

I, Robert Lashua, depose and hereby state that the following is true:

1. I am employed by the Commonwealth of Massachusetts Department of Correction at the Souza Baranowski Correctional Center. My business address is P.O. Box 8000, Shirley Road, Shirley MA 01464.

2. I have been employed by the Commonwealth of Massachusetts Department of Correction since 1983. From 1983 to 1987, I was a Correction Officer at MCI-Shirley Minimum. From 1987 through 1999, I was a Training Instructor at the Department's Basic Training Academy; from 1991 to 1997, I was promoted to Sergeant and assigned to MCI-Shirley Medium. In 1998, I was assigned to the newly opened maximum-security prison, the Souza Baranowski Correctional Center (SBCC), where I have remained. I hold the rank of Lieutenant.

3. I have been awarded various commendations and honors in my employment with the Department of Correction, including the Department of Correction Medal of Valor and the Correction Officer of the Year Award. I have also been awarded the Commonwealth of Massachusetts Citation for Outstanding Performance.

EXHIBIT
4

2

4. I have completed annual training on inmate procedures and forced cell extractions as required by Department of Correction regulations, which require at least forty hours of annual training for every correction officer. In addition, I have received training as a Move Team Leader.

5. The officers named as defendants in the above-captioned action were awarded Department of Correction Commendations for the manner in which we performed the forced cell extraction on Michael Baez on June 26, 2002, which is the subject of the present lawsuit.

6. I was present at SBCC on June 26, 2002, and I observed part of the inmate demonstration in the K-3 South Special Management Unit. Inmates had refused to return their meal trays during the day, were covering their doors' observation windows, throwing trash out on the tier, and flooding their cells by blocking their toilets and repeatedly flushing. The water was turned off to the cells, and the inmates were ordered to be removed from the housing unit. I was assigned as a Team Leader for a move team at about 3:15 p.m. and participated in several forced extractions during the afternoon and evening.

7. Baez was a special management inmate in the North K-3 Special Management Unit (SMU) on June 26, 2002, and was identified as an active participant in the inmate disruption, who had to be removed from the K-3 unit.

8. Pursuant to 103 CMR 505, Standard Operating Procedures, IV.B.1, whenever an inmate is to be moved outside of the SMU, he must be handcuffed behind his back and placed in

3

leg irons. The regulations require that these restraints must be placed on the inmate before the cell door is opened.

9. Routinely, pursuant to 103 CMR 505, Standard Operating Procedures, IV.B.3, all movement of inmates outside of the SMU must be by hand-on escort by two staff members.

10. On June 26, 2002, I gave Baez several orders to step to his cell door to be handcuffed and leg irons applied so that he could be moved out of the K-3 SMU after it was flooded by toilet water, and the water to cells had to be turned off.

11. Baez refused every order to come to his cell door to be cuffed.

12. The Shift Commander, Captain Shaun Dewey, received authorization for Superintendent Edward Ficco, to use physical force to remove Baez from his cell and relayed that order to me.

13. Captain Dewey advised me that Baez had contraindications for the use of chemical agents.

14. At about 8:51 p.m., I assembled an extraction team as follows: Brian McManus, shield person; David Bolduc, left extremity; David Shaw, right extremity; Edmund Preston, restraints; and Michael Cravedi, alternate.

15. The responsibilities of each position on an extraction team is as follows:

The Team Leader supervises the team and gives all verbal commands to the team and the inmate. He is responsible for briefing and the deployment of chemical agents. The Team Leader is responsible for determining the appropriate course of action in the circumstances created by the inmate for each extraction, and makes the final attempt to obtain voluntary

4

cooperation from the inmate before the actual deployment of a chemical agent or physical force. The Team Leader must position himself to maintain constant visual contact of the events.

The Shield Person assures the proper use of the shield, which includes, entering the cell first, making the first contact with the inmate, and using a forward and downward application of physical force to bring the inmate to the floor for cuffing. He assists in controlling the inmate for cuffing.

The Right Extremity Person provides support on the right side of the Shield Person and is responsible for controlling the inmate's upper body on the right.

The Left Extremity Person provides support on the left side of the Shield Person and is responsible for controlling the inmate's upper body on the left side.

Both the Right and the Left Extremity persons help to subdue the inmate by placing their hands on the shoulders of the Shield Person, thereby adding additional strength to the ability of the Shield Person to control the inmate's movements and bring him to the floor for cuffing.

The Restraint Person is responsible for controlling the inmate's lower body while the team tries to contain the inmate's movements. After containment, he is responsible for applying hand and leg restraints.

Once the inmate is contained, the Shield Person contains the inmate by holding the shield on him while the Restraint Person applies the handcuffs and leg irons on the inmate.

5

The extraction team members continue to        maintain control of the inmate according to their respective positions until after the inmate is searched, examined and treated by medical staff, and secured in another cell.

16. Pursuant to regulation, after the inmate is placed in restraints and removed from his cell, no medical examination or treatment can be conducted until he has been placed in a secure location and completely strip-searched by the team.

17. At about 8:35 p.m., acting as an impartial party, the SBCC Mental Health Director for the University of Massachusetts Correction Health Services went to Baez's cell in an attempt to persuade Baez to comply with the Department of Correction's orders to "cuff up." Mr. Radosta warned Baez that the Superintendent had authorized the use of physical force to remove Baez if he did not comply. Mr. Radosta reported the above information to Captain Shaun Dewey, the Shift Commander, and me, and added that Baez did not acknowledge his presence, but that he had heard the sounds of objects, possibly metallic, banging against each other inside Baez's cell. A true and accurate copy of the contemporaneous Incident Report submitted by Radosta is attached hereto as Att. 3.

18. During the evening, IPS Sergeant Nestor Cruz and C.O. Edward Gonzalez reported to me that Baez had been yelling threats in Spanish to the other inmates on the tier, about his intentions. A true and accurate copy of the contemporaneous Incident Reports of these officers is attached hereto as Att. 4 and Att. 5.

19. Gonzalez reported that Baez was yelling that he had rigged his door with pieces of his meal tray, silverware, magazines and cosmetics wedged in his door track. He told the

6

other inmates that he had some type of barrier tied up so that was not going to be cut down for a long distance, and that someone was going to have to come through the door to cut it down. Baez stated that he stood up "like a Samurai" and was flashing his "swords."

20. Baez stated to the other inmates that his weapons were scaring the officers away. Baez also stated that he would stab a K-9 dog if it were used against him.

21. Gonzalez reported that Baez was telling the other inmates that he would not go down without a fight. Baez was repeatedly reminding the other inmates that he "couldn't be gassed."

22. When other inmates warned Baez that the canine unit would be used against him, Baez laughed.

23. Baez also bragged to other inmates that the officers would have to fight to get through the barrier, giving Baez time to fight the advance, and giving him "time to strike."

24. At about 9:00 p.m., I approached Baez's cell door and told him who I was and that force was authorized to remove him from his cell if he did not comply with my orders.

25. Baez had completely covered the observation window in his cell door so that I could not see in. This action violated the rules of the Department of Correction and SBCC.

26. I then ordered Baez to uncover his window and present himself to be cuffed.

27. Baez refused.

28. I then ordered an officer to open the food slot or "wicket" lower down in the cell door so that I could see into the cell.

7

29. When I looked in, I saw that Baez had strung numerous trip ropes made from torn bed sheets throughout his cell.

30. Baez was sitting on his desk with his hands between his legs in such a manner that I could not determine if he had anything in his hands.

31. I ordered Baez to show his hands and he refused.

32. As Sgt. Cravedi and I continued to observe Baez through the slot, discussing the logistics of entering the cell, Baez suddenly leaped from his desk and charged the door, with two sharpened instruments attached to his wrists.

33. Baez slammed a large broken food tray through the food slot and into the shield Sgt. Cravedi was holding against the door, then kicked his foot out of the wicket striking the shield.

34. I ordered that the wicket be sealed, ordered the team to stand down, and left the tier to consult with Captain Dewey. We decided to remove the team from the tier and reassess the situation.

35. At about 9:12 p.m., Sgt. Cravedi and I briefed Captain Dewey on the types of weapons Baez had, the condition of his cell and his violent demeanor. Captain Dewey told me to stand by and he would notify his chain of command.

36. At about 10:19 p.m., Captain Dewey briefed my team and introduced three new members to the extraction team, C.O. John Flowers, C.O. Joseph Rackett, and the Canine Unit Sgt. and his dog Rio.

8

37. Capt. Dewey ordered my team to approach Baez's cell and inform him that the K-9 unit was on the tier, and order him to come to the door to be cuffed up and removed from his cell.

38. At about 10:23 p.m., I informed Baez through his cell door that the K-9 unit was on the tier, and I opened the wicket to view Baez. Baez refused orders to cuff up, but surrendered numerous sharpened weapons made from some of the pieces of his meal tray.

39. Baez refused another order to come to the door and be cuffed, and I ordered the wicket closed and the team off of the tier at about 10:25 p.m.

40. At about 11:08, the extraction team received a third briefing from Capt. Dewey. We discussed modifying the move team configuration given several factors, such as Baez's violent disposition; the strong possibility of his being possession of weapons; the fact that chemical agents could not be used; and the fatigue of the team, most of whom had been working a complete shift since 3:00 p.m., and had moved several other inmates from the tier.

41. The extraction team was modified to place Officer Bolduc as an additional shield person, Officer Flowers as Restraint Person, and Officer Preston as Left Restraint Person.

42. The additional shield was to protect the team from sharpened weapons.

43. The additional staff was to ensure that Baez did not exit his cell and enter the tier where there were unprotected staff conducting eye-to-eye watches on the remaining inmates.

9

44. We rehearsed the team's positions several times because of the additional staff and shield, and the impediments they might create in entering the narrow doorway and entry area just inside the cell door.

45. At about 11:12 p.m., I again approached Baez's cell door and ordered him to uncover his window and to present himself to be cuffed, and again Baez refused.

46. I ordered the wicket to be opened, and I viewed Baez sitting again on his desk at the rear of his cell, and he was sitting in such a way that I could not determine what, if anything, he had in his right hand.

47. I ordered Baez to show me his right hand and he refused.

48. At 11:13, p.m., I ordered the team to stand down, and left the tier to consult with Capt. Dewey one last time.

49. Capt. Dewey and I determined based on my observations that Baez's actions indicated that he would not comply peacefully with being removed, and that he posed a serious threat of grave bodily harm to anyone entering his cell, and anyone on the tier if he escaped from the cell unrestrained, and therefore that the extraction team would have to use whatever physical force was reasonably necessary to forcefully restrain and remove him from his cell.

50. I returned to my team and briefed them one last time to ensure that everyone was aware of his role.

51. At about 11:16 p.m., I gave Baez one last chance to comply without the use of physical force, and ordered him to uncover his window and submit to cuffing, and Baez refused.

52. As a result, I ordered the team to go into the cell to remove Baez.

10

53. Locksmith Stone unlatched Baez's door  and Sgt. Cravedi pulled it open.

54. As team leader, I maintained a constant visual observation from my position outside the door of the cell.

55. As Officer McManus entered the cell, first in single file, Baez charged at him with a large sharpened instrument, leaping from his desk to the top of his bunk, and striking repeatedly downwards at McManus's head and shoulders.

56. Officer McManus shouted, "Shank!" and made contact with his shield, but Baez continued to punch at McManus's head and body with the weapon.

57. I ordered the alternate team members to enter the cell as well, and they made secondary contact with Baez, and he fell very hard from his bed headfirst to the concrete floor with the team members.

58. The whole team fell over the trip ropes hard along with Baez as they tried to evade his blows, and to contain him.

59. Baez hit his head and face on the concrete floor with a hard blow as he fell off of the bed, struggling to stab the officers.

60. I ordered Sgt. Cravedi to begin cutting the trip ropes that Baez had tied across his cell while Baez continued to struggle violently with the team as they tried to restrain him.

61. Baez struck Officers McManus, Preston, and Bolduc several times with the sharpened weapon as they struggled with the tangle of trip ropes and Baez.

62. Baez continued to stab at the officers until Officer Shaw, coming in around  McManus, Preston, and Bolduc, who were still  trying unsuccessfully to hold Baez down, managed to grab Baez's hand.

11

**63.** After a struggle, Shaw was able to wrestle the weapon from Baez's hand.

**64.** Baez continued to strike blows on McManus, Preston, and Bolduc, as Sgt. Cravedi cut the numerous wraps that Baez had tied around his wrists and ankles so that restraints could be applied, which they were, and at about 11:20 p.m., the team exited the cell with Baez, and placed him on a mattress outside the cell where he was strip-searched.

**65.** Sgt. Cravedi continued to cut the many straps and wraps the inmate had tied to his body.

**66.** Baez's lower scrubs were cut off to facilitate the search.

**67.** When the search was completed, the team placed Baez into waistchains and his handcuffs were removed.

**68.** The waistchains make it easier for the medical staff to conduct an examination.

**69.** The team transported Baez to the Nurse Protocol Room for an examination, with each member holding him down according to his designated position, and with a shield being held above Baez's face to prevent him from spitting on medical staff.

**70.** During this entire period, it was clearly Baez's intent to inflict serious bodily injuries on any officers with whom he came into contact.

**71.** In my experience and training, inmates use trip ropes and wrist and leg wraps in order to slow down an extraction team so that the inmate can gain a tactical advantage in his planned physical attack on the individual officers as they enter his cell in a forced move.

**72.** At any time that Baez complied with my verbal orders to submit to being cuffed, the use of physical force to subdue him would have been halted.

**73.** Once Baez refused the final order to submit to cuffing, and his SMU cell door had to be opened with him still unrestrained by handcuffs and leg cuffs, 103 CMR 505 required

12

that the move team officers immediately use physical force with the shield and the holding of his upper body to force Baez to the floor until he lay cooperative on the cell floor and submitted to being placed in restraints.

74. Baez could at any time have cooperated with the extraction team inside of his cell by not struggling with the extraction team officers, and instead quickly lying on his cell floor and letting himself be held down until the application of handcuffs and leg restraints was completed.

75. The goal of the extraction team in this case, as in every cell extraction, was to bring the inmate to the floor and to apply restraints using the least physical force necessary to accomplish this goal.

76. By struggling violently with the officers at every step both while armed and after being unarmed, Baez increased the volatility of the move, the risk of serious injury to himself and the officers on the team, and the amount of physical force that the extraction team had to use to contain and subdue him.

77. Until Baez was completely strip-searched, we could not be sure that Baez was completely disarmed of weapons.

78. Even cuffed, an armed inmate is a serious threat to the safety of corrections staff and other inmates.

79. At about 11:50 p.m., we were relieved by other correction officers, left the Nurse Protocol Room and the SMU, and had no further contact with Baez.

80. None of the relief correction officers who had contact with Baez after we left are named as defendants in this lawsuit.

13

81. I observed the actions of my extraction team at all times while Flowers, Preston, Cravedi, McManus, Shaw, Rackett,          and Bolduc, had contact with Baez, including but not limited to the contact required to subdue Baez, defend themselves and others, disarm him, forcibly remove Baez from his cell, remove Baez's clothing, extra clothing, and wraps, conduct the strip search, and apply handcuffs, a waist chain, and leg irons.

82. In performing their duties as described above, the extraction team officers necessarily had to have contact with Baez, to move Baez around and to reposition his body and his extremities.

83. At all times, Baez continued to resist the officers and struggled with them.

84. No officer touched Baez improperly or with more force than necessary to defend himself and others, to effectuate the forced extraction, search Baez, apply restraints, or contain him during the medical check.

**85.** No officer punched Baez or abused any part of Baez's body in order to cause unnecessary pain or injury during the entire incident.

**86.** At no time did Superintendent Edward Ficco have any contact with Baez, nor was he present during the extraction and medical check or at any time before were relieved from duty and left SBCC.

**87.** Attached as Att. No. 1 is a true and accurate photograph of the sharpened weapon that I saw tied to Baez's hand, with which he struck Officers McManus, Preston, and Bolduc during the forced cell extraction at about 11:17 p.m. on June 26, 2002.

**88.** The weapon has an approximately five- or six-inch long blade.

14

89. Attached as Att. No. 2 is a true and accurate photograph of the other weapons Baez had fashioned from pieces of his food tray, with which Baez slashed through his food slot on June 26, 2002, and later threw out of his food slot before the forced extraction.

Signed under penalty of perjury on this the _____10ᵀᴴ_____ day of July 2007

Robert Lashua

**EVIDENCE**

TYPE OF OFFENSE -   10  WEAPON

DESCRIPTION - SHARPENED  TOOTHBRUSH

SUSPECT - MICHAEL  BAEZ    W69027

DATE : 6/26/02

TIME - 11:30 PM

LOCATION - K3-23

RECOVERED BY - SGT. MARSHALL

LAShVA's Tcm



EXHIBIT A

att 1
2pages



## EVIDENCE

TYPE OF OFFENSE -    10    WEAPON

DESCRIPTION - SHARPENED    FOODTRAY

SUSPECT - MICHAEL  BAEZ    W69027

DATE : 6/26/02

TIME : 10:24 PM

LOCATION - K3 - 23

RECOVERED BY : - LOCKSMITH    STONE

Tibodo



EXHIBIT A
att. 2
4 pages



**EVIDENCE**

TYPE OF OFFENSE - 10 WEAPON

DESCRIPTION - SHARPENED FOODTRAY

SUSPECT - MICHAEL BAEZ W69027

DATE - 6/26/02

TIME - 10.24 PM

LOCATION - K3-23

RECOVERED BY - LOCKSMITH STONE

Tibert





**MASSACHUSETTS DEPARTMENT OF CORRECTION**
**SOUZA-BARANOWSKI CORRECTIONAL CENTER**
**INCIDENT REPORT**

DATE: 6/26/02   LOCATION: SSMU   TIME: 8:35 PM.

CODE: 7

FROM: MARK RADOSTA   DEPT.: MENTAL HEALTH

INMATE'S NAME: MICHAEL BAEZ   COMM. #: W-69027

Using BLACK INK, please write/print your report clearly. Use additional pages if necessary.

This writer, acting in capacity of an impartial party on 6/26/02 at approx 8:35 PM, did approach cell K3-23 belonging to Michael Baez in order to notify him that unless he complied with DOC orders to cuff up, the Superintendent had authorized the use of force to remove him from his cell. The inmate did not acknowledge my statement either verbally or otherwise, but this writer heard sounds from inside the cell of objects against object, perhaps metallic in nature. Writer then left the tier and was debriefed by Captain Dowey on tape. EOR

Signed: Mark Radosta LICSW

Title: MENTAL HEALTH DIR.

Distribution:   Superintendent   Director of Security
                Deputy of Programs   Shift Commander
                Deputy of Operations
                IPS



EXHIBIT A

att 3

**MASSACHUSETTS DEPARTMENT OF CORRECTION**
**SOUZA-BARANOWSKI CORRECTIONAL CENTER**
**INCIDENT REPORT**

DATE: 6/26/02  LOCATION: K-3 SMU #23  TIME: 8:45 PM

CODE: _____

FROM: Edwin Gonzalez  DEPT.: SECURITY

INMATE'S NAME: BAEZ, Michael  COMM. #: W-69027

**Using BLACK INK, please write/print your report clearly. Use additional pages if necessary.**

On Wednesday June 26, 2002 at approximately 8:45 p.m., I CO E. Gonzalez did overhear inmate Baez, Michael W-69027 yell to other inmates in the K-3 South SMU in spanish that he had rigged his door with a piece of his meal tray, pieces of plastic feeding silverware, magazines, and cosmetics wedged between the small crease of his door in cell #23. Inmate also stated that he had some type of barrier tied up that was not going to be cut from long distance. Someone was going to have to come through the door to be able to cut it down. Inmate stated that he stood up like a samurai as he joked about flashing his swords. Inmate Baez also joked that his weapons had scared the officers away. Inmate Baez stated that he would stab a K-9 dog if it was used against him. He said he would not go down without a fight. Inmate continously stated that the officers were mad because he could not be gased. Other inmates warned him that a K-9 dog would probably be used. He laughed and said that the officers would had to get through his barrier giving him reaction time to fight the advance giving him time to strike. ⟋— E O R —⟍

Signed: _Edwin L. Gonzalez_

Title: CO I

Distribution:    Superintendent        Director of Security
                 Deputy of Programs    Shift Commander
                 Deputy of Operations
                 IPS

EXHIBIT A
att. 4

## MASSACHUSETTS DEPARTMENT OF CORRECTION
## SOUZA-BARANOWSKI CORRECTIONAL CENTER
## INCIDENT REPORT

**DATE:** 6/27/02    **LOCATION:** K-3, SMU    **TIME:** 8:45 p.m.

**CODE:** #'s 4,5 & 6. Threats, Disturbance,

**FROM:** Nestor Cruz    **DEPT.:** Inner Perimeter Department

**INMATE'S NAME:** Baez, Michael    **COMM. #:** W69027

**Using BLACK INK, please write/print your report clearly. Use additional pages if necessary.**

On June 26, 2002 at approximately 8:45 p.m., this reporting officer while monitoring disruptive inmates in the Special Management Unit K-3 being removed from their assigned cells for flooding out their and refusing to return their food trays did hear inmate Baez, Michael W69027 make the following threatening statements. Inmate Baez was telling other inmates that he was in possession of two weapons and that he looks like a "Sumarai". He further stated that the officers are afraid of him. He went on to say that if the dog (K-9) was introduced in his cell he will kill the dog because he does not care about anything. He also stated that he had created a web like trap in his cell so when the officers entered the cell they would have hard time getting to him. Inmate Baez further stated that he has done this kind a thing numerous times and received sanctions for up to five moths and he didn't care. He continued to say that he would kill the dog. At approximately 9:15 p.m., the K-9 dog was introduced in the tier (K-3) at that time inmate was yelling that the dog was only a poppy and it was nothing for him.

This information was relayed to Captain Edward Williams, Captain Shawn Dewey and the move teams.

Reporting Officer Signature

Nestor Cruz, IPS Sergeant

**Distribution:**    Superintendent    Director of Security
Deputy of Programs    Shift Commander
Deputy of Operations
IPS



EXHIBIT A

exh. 5

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-11045-GAO

MICHAEL BAEZ,
　　Plaintiff

　　　v.

MICHAEL MALONEY, et al.,
　　Defendants

### AFFIDAVIT OF MICHAEL CRAVEDI

I, Michael Cravedi, depose and hereby state the following.

1. I am employed by the Commonwealth of Massachusetts Department of Correction at the Souza Baranowski Correctional Center. My business address is P.O. Box 8000, Shirley Road, Shirley MA 01464.

2. I have been employed by the Department of Correction for approximately seventeen years. From 1990 to 1997, I was a correction officer at MCI-Shirley Medium; from 1997-1998, I was assigned to MCI-Concord, a medium security facility; from 1998 to the present, I have been assigned to the Souza Baranowski Correctional Center ("SBCC"), a maximum-security facility. I hold the rank of sergeant.

3. The Department of Correction requires that all correction officers receive forty hours of training every year. This training includes training on the correct procedures to restrain an inmate, and how to use force to minimize the risk of injury to staff and the inmate, pursuant to the Department's regulations and policies.

4. I also hold a position on the Department of Correction Special Response Team (SRT). This team is a specially trained and experienced unit with the authority to use firearms



EXHIBIT
B

2

when ordered by the chain of command. The SRT is organized under the leadership of the commander of the centralized Special Operations Division, and is periodically called into action by the Commissioner of Correction to respond to emergency situations at any of the correctional institutions. Once a month, this unit receives specialized training on the forced movement of inmates, and the use of firearms, weapons and chemical agents. This training is in addition to the forty hours of required annual training for all correction officers, which also includes training on the proper use of force on inmates.

5.   Corrections officers may be ordered by the superintendent of a prison to use force on an inmate on the institutional level, and not as part of the Special Operations response teams.

6.   In both situations, correction officers are trained and adhere to Department of Correction regulations, including 103 CMR 505, Use of Force.

7.   At all times, officers use the minimal amount of force necessary to place the inmate in restraints, i.e. handcuffs and waistchain, and leg irons, and only after authorization from the superintendent or commander of the Special Operations Unit.

8.   The progression from verbal orders to submit to placement of restraints to the use of physical force is stopped at any time an inmate submits peacefully to the application of restraints.

9.   If the inmate has refused repeated orders to step to the closed door of his cell and be cuffed, the "move" or "extraction" team is given the order to open the door and enter the cell. At this point, the goal of the team is to quickly obtain control of the inmate by

3.

physically forcing him quickly to the floor for the application of restraints.

10. The reason for the requirement of bringing the inmate to the floor is that by his repeated refusals to submit to restraints after being warned that the use of force is authorized, the inmate has demonstrated that he is a threat to security, and that he will not comply unless force is used.

11. In the circumstances described above, the opening of the cell door to the unrestrained inmate creates a serious risk of injury to staff, and the security of the institution is threatened. Immediate control of the inmate in his cell is of utmost importance to reduce the risk.

12. In addition, Special Management (SMU) inmates, such as Michael Baez, are by regulation required to be in restraints before the cell door can be opened. The reason is that SMU inmates have a history of violence requiring special management.

13. Once the cell door is opened, the resistant inmate has waived all prior opportunities to avoid the use of force.

14. If the inmate quickly submits to the application of restraints once the extraction team brings him down to the floor, the use of force ceases.

15. However, the more the inmate fights and struggles with the extraction team, the greater the amount of force the officers must exert in order to apply the handcuffs and leg restraints.

16. According to regulations, a complete strip search for concealed weapons and contraband must be conducted on every inmate involved in a forced cell extraction before the

4

medical staff sees him.

17. After a forced cell extraction, medical staff examines the inmate involved immediately after the strip search.

18. I have participated in at least thirty forced moves and cell extractions of inmates either on institutional extraction teams or as a part of the SRT.

19. On June 26, 2002, at 2:50 p.m., I was working my regular shift at SBCC, when I was assigned to an institutional extraction team to quell an inmate disturbance in the South Special Management Unit (SMU) in the K-3 Housing Unit. During the day, the extraction team moved a number of inmates who were refusing to give up their meal trays and flooding the tier with toilet water.

20. Michael Baez was one of these inmates. Baez was being disruptive, non-compliant with orders to permit handcuffs be placed on him so he could be moved from his cell, had flooded his cell by stuffing cloth into his toilet and flushing, and he refused to relinquish his food tray when ordered to do so. Food trays have to be removed after every meal because they are made of hard plastic and can be made into sharpened weapons.

21. Baez was in possession of at least one weapon.

22. The water to the K-3 unit was turned off because of the flooding.

23. Baez refused orders to come to his cell door and be cuffed so that he could be moved out of the housing unit.

24. Based on Baez's actions, Superintendent Ficco authorized the use of force if necessary to apply restraints and extract Baez from his cell.

5

25. At about 9:00 p.m., the Team Leader Lt. Robert Lashua and I tried to observe Baez in his

cell to calculate the best plan for removing him with the minimum risk.

26. I saw that Baez had covered the observation window on his cell door, and had jammed

the locks and door track with pieces of plastic, books, and cloth.

27. Lt. Lashua and I opened the cuff slot in the door and looked into Baez's cell.

28. I saw that Baez had rigged his cell with trip wires creating a cobweb effect by stringing

torn pieces of cloth back and forth across the width of his cell.

29. In my experience and training, I am familiar with the reason that inmates rig their cells

with trip wires when refusing to comply with orders to cuff up and come out of their

cells.

30. Officers entering a cell must enter through the door in single file because the opening

and the front portion of the cell are not wide enough to admit two across. The trip wires

slow down the entrance of the first officer, and in many cases can cause him to trip,

making him and those behind him more vulnerable to attack by the inmate. As a result,

the inmate who lies in wait has a better chance to inflict serious physical injury on the

officers, one by one, as they enter.

31. The trip wires also impede the officer's ability to subdue the inmate and make it more

likely that the inmate will be able to escape from the cell and make it into the corridor

wearing no restraints. This places the personnel standing nearby in the corridor at grave

risk of harm, and can lead to a hostage-taking situation.

32. When an inmate is armed with a weapon, the risk of grave physical injury or death is

6

great.

33. When I looked at Baez through the door slot, I saw him sitting on his desk on the far side of the trip wires, with his hands concealed between his legs.

34. Baez refused Lt. Lashua's orders to show his hands.

35. Baez suddenly jumped from his desk and charged the door.

36. I saw two large sharpened instruments strapped to Baez's wrists.

37. Baez slammed two broken pieces of food tray at us through the door slot.

38. Baez then kicked his foot out of the food slot striking the shield that I held

39. Lt. Lashua ordered the food slot to be sealed and we left to confer with the Captain to reassess the situation.

40. We briefed the Shift Commander Captain Shaun Dewey, who was reporting to the superintendent, about the weapons Baez possessed, the condition of his cell, and his violent demeanor.

41. At least twice that evening, Captain Dewey had the mental health director try to reason with Baez in an attempt to obtain his compliance and to submit peacefully to the placement of restraints through his cell door slots.

42. Baez refused.

43. During this entire period, I heard Baez yelling in Spanish to other inmates in the housing unit.

44. Between 11:00 and 11:08 p.m., Lt. Lashua again briefed the extraction team members. The plan was to again try to convince Baez to abandon his combative stance, come to the

07/09/07  22:44 FAX 978 514 8531  CAPTIANS OFFICE  ☐008
Case 1:05-cv-11045-GAO  Document 46  Filed 07/13/2007  Page 62 of 92
(7/8/2007) Martin Leonard - affid Cravedi.doc  Page 7

7

cell door to let officers place handcuffs and leg restraints on him, and come out peacefully.

45. The order was given to Baez and again Baez refused to do so.

46. We realized that the next level of force was required. So the canine officer was called in.

47. In my experience in forced extractions, just the appearance of the canine unit in the housing unit is enough to make combative inmates realize that violence is useless, and convince them to submit to the application of handcuffs and leg restraints without force.

48. Baez, however, threatened to kill the dog and continued to refuse to come to the door of his cell and be cuffed. We knew Baez was armed, so we withdrew the canine unit. The next level of force therefore became necessary.

49. Usually, the next level of force is the use of a chemical agent sprayed into the food slot. This will cause the inmate's eyes to water and, in many cases, distracts and subdues the inmate enough that no further force is necessary to apply restraints. However, we received a contraindication order for Baez indicating that he had a medical condition that prevented the use of a chemical agent. So we did not use it.

50. Instead, Lt. Lashua and the team discussed other options with the intent of using the minimum amount of force necessary to gain entry to Baez's cell, subdue him, and apply handcuffs and leg irons. We talked about the possible use of various non-lethal munitions, but rejected these ideas.

51. The team devised a plan that included the addition of more officers to the team. These officers would carry an extra shield and act as a wall to prevent Baez from escaping from

8

his cell and attacking the unprotected personnel out on the tier.

52. The extraction team went to a cell in the empty SMU on the other side of the building, which was identical to Baez's cell in size and layout, and practiced every scenario we thought that Baez could devise. We knew he was armed and that he had laid a trap meant to slow the team down and inflict as much injury as possible on the officers entering his cell.

53. The goal of the forced extraction and the dry run was to make sure we could proceed with the minimal force necessary to subdue and disarm Baez so as to reduce the risk of injury to both Baez and the officers.

54. We also needed to also incorporate the extra shield in a way that would prevent Baez's escape without the shield becoming an impediment to the officers in the tight space, while also permitting the first officers in to disarm Baez without inflicting or incurring any injuries.

55. At about 11:11 p.m., I entered the K-3 Tier with the extraction team.

56. The extraction team consisted of correction officers Brian McManus as 1st shield person, Edmund Preston in the left extremity position, David Bolduc in the 2nd shield position, David Shaw in the right extremity position, John Flowers in the restraints position, and Joseph Rackett, and myself as alternate team members.

57. We had all been trained on the functions of each of these positions pursuant to the 103 CMR 505 policy.

58. At about 11:12 p.m., Lt. Lashua looked into Baez's cell one more time through the food

9

slot and informed the team that he could not see Baez's hands, or what, if anything, he held there.

59. Lashua also informed the team that Baez was sitting at a vantage point on top of his desk.

60. Baez had completely booby-trapped his cell with a cobweb-like stringing of his cell with torn cloth, and placed his mattress against the door.

61. At about 11:16 p.m., Baez again refused Lt. Lashua's final orders to remove the covering from his window and to submit to being handcuffed peacefully.

62. Lt. Lashua ordered the extraction team to enter the cell and forcibly remove Baez.

63. An SBCC locksmith un-jammed the cell door, and Correction Officer Brian McManus, the first shield man, entered the cell.

64. Baez immediately leaped from his desk onto his bunk and repeatedly tried to stab C.O. McManus with a large sharp weapon.

65. I heard C.O. McManus shout, "Shank" to warn officers of the weapon.

66. Baez continued to stab at McManus and C.O. Preston, who had entered behind him.

67. C.O. Bolduc entered the cell right behind McManus and Preston, and at some point, one of the officers managed to knock Baez off of the bunk to the concrete floor, where he continued to strike at officers, who were struggling with him and the tangled trip wires.

68. Baez and the officers struggling to subdue him fell hard onto the concrete floor.

69. One of the officers was eventually able to take away a weapon from Baez, but restraints could not be applied because Baez continued to fight, kick at and punch the officers. In

10

addition, Baez had precluded the application of restraints by wrapping his wrists so heavily with strips of cloth that they would not fit.

70. I entered last, and proceeded to cut away the numerous trip wires, and the numerous leg, wrist, and body wraps that Baez had attached to his cell and wrapped around his body, while the other officers tried to evade Baez's blows and hold him down.

71. When handcuffs could be applied, the team carried Baez from his cell. He was still fighting the officers, but was handcuffed.

72. The team placed Baez on a mattress placed on the floor of the corridor for that purpose, and I continued to cut away at the wrist wraps and extra clothing on Baez so that a proper strip search could be conducted and the remaining restraints applied.

73. Baez was still wearing multiple layers of clothing, and had wrapped several layers of cloth around all of his extremities, making it impossible to apply further restraints, as required by regulation, without first cutting the cloth away.

74. In my experience and training, I know that inmates apply these types of wraps when preparing for a physical confrontation with a forced extraction team. They do this in order to evade the application of restraints for as long as possible, making it possible to escape and inflict serious physical injuries on as many staff members as possible.

75. I assisted other officers in stripping Baez of all his clothing as required to conduct a complete strip search for other concealed weapons. This was necessary before Baez could be taken out of the unit for a complete medical examination, to ensure that Baez did not bring weapons out of his cell to make another attack on staff, including

07/09/07 22:15 FAX 978 514 8531 CAPTIANS OFFICE ☒012
Case 1:05-cv-11045-GAO Document 46 Filed 07/13/2007 Page 66 of 92
(7/8/2007) Martin Leonard - affid Cravedi.doc Page 11

vulnerable nurses and medical staff, or other inmates.

76. At about 11:25 p.m., Baez was carried to the Nurse Protocol Room for a complete examination.

77. None of the defendants in this lawsuit had any involvement with Baez's treatment in the Protocol Room or the conditions of his confinement there, except to provide security for medical staff by holding him down and shielding his face to prevent Baez's spitting at the nurse while she examined him.

78. At about 11:50 p.m., new correction officers arrived to relieve the extraction team, and the extraction team left Baez with them in the Nurse Protocol Room, and after being debriefed by Lt. Lashua and briefing Captain Dewey, the members of the extraction team departed SBCC for the night.

79. At all times when the extraction team members had contact with Baez, in subduing Baez, defending ourselves, disarming him, forcibly removing Baez from his cell, removing Baez's extra clothing and wraps, conducting the strip search, and applying the handcuffs, a waist chain, and leg irons, we necessarily had to have contact with Baez, to move Baez around and to reposition his body and his extremities. At all times, Baez continued to resist officers and struggled with them. No officer touched Baez improperly or more than necessary to defend himself, effectuate the forced extraction, search Baez, or apply restraints.

80. No officer punched Baez or abused any part of Baez's body in order to cause unnecessary pain or injury during the entire incident.

12

Signed under penalty of perjury on this the _____ day of July 2007.

Michael Cravedi

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-11045-GAO

MICHAEL BAEZ,
    Plaintiff

    v.

MICHAEL MALONEY, et al.,
    Defendants

## AFFIDAVIT OF DAVID BOLDUC

I, David Bolduc, depose and hereby state the following.

1. I am employed by the Commonwealth of Massachusetts Department of Correction at the Souza Baranowski Correctional Center. My business address is P.O. Box 8000, Shirley Road, Shirley MA 01464.

2. I have been employed by the Department of Correction for approximately eleven years. From 1996 to 1998, I was a correction officer at the North Central Correctional Institution, a medium security institution; from 1998 to the present, I have been assigned as a correction officer to the Souza Baranowski Correctional Center (SBCC), a maximum-security institution.

3. I am also assigned to the Department of Correction Special Operations Tactical Response Team (TRT). This team is a specially trained unit, under the leadership of the commander of the centralized Special Operations Division, periodically called into action by the Commissioner of Correction to respond to emergency situations at any of the correctional institutions. Once a month, as a member of this team, I receive specialized training on the forced movement of inmates. This training is in addition to



2

the forty hours of required annual training that I receive as a correction officer, which also includes training on the proper use of force on inmates under 103 CMR 505.

4.  I adhered to the 103 CMR 505.00 Department of Correction Use of Force policy in participating in the use of force on Michael Baez on June 26, 2002.

5.  The other defendants in the present lawsuit, except Edward Ficco, are or were members of the Special Operations Special Response Team, or the Tactical Response Team, and receive the same additional specialized training on uses of force.

6.  I have participated in at least thirty forced movements of inmates in my career with the Department of Correction.

7.  The forced moves described above include cell extractions that I have performed both as a correction officer and as a member of the TRT.

8.  In my experience, I have faced many situations where inmates who want to inflict as much injury as possible on officers entering their cells in a forced cell extraction, will attach trip wires and web their cells in order to slow down the officers. This gives the inmates enough time and opportunity to find vulnerable spots on the officers to stab them despite their protective gear.

9.  Because the narrow space just inside the cell door requires the officers to enter in a single file before spreading out, the inmates uses the trip wires to gain a tactical advantage.

10. In my experience as a maximum-security correction officer and on the TRT, it is common knowledge in the maximum-security prison environment that the goal of an

3

inmate in a forced cell extraction is to inflict as much injury on staff as possible and thereby gain status in the inmate population.

11. On June 26, 2002, I was assigned as the second shield man on the move team that was assembled to extract Michael Baez from Cell #23 in the Special Management K3 housing unit at SBCC.

12. I was present when Baez refused orders to come to the cell door and place his hands in the food slot to be handcuffed and removed from his cell without force.

13. I was also present during the practice sessions in the empty cell on the other side of the SMU while we tried a dry run of the best possible way to conduct the cell extraction with the minimum amount of force.

14. I was present during the briefing sessions before the actual extraction, and knew that Baez was armed with at least one weapon, and was poised to attack and possibly escape upon our entry into his cell.

15. As second shield man, I was the third officer to enter Baez's cell after Baez refused the final order to submit to cuffing or physical force would be used.

16. We entered single file, with Correction Officer Brian McManus going first, Correction Officer Edmund Preston behind him, and I was third.

17. I saw Baez leap from his desk to his bunk brandishing a large sharpened weapon in his right hand.

18. C.O. McManus yelled, "Shank."

19. Baez lunged at C.O. McManus, striking him several times with the knife.

4

20. Baez stabbed at C.O. Preston, hitting him several times in the chest, back, and head area.

21. Baez continued lunging at McManus and Preston from his vantage-point on the bunk, thrusting downwards at them with the weapon.

22. At this time, I entered Baez's cell.

23. I attempted to go around Preston and McManus, to secure Baez.

24. At this time, Baez fell from his bunk and hit his head and face on the concrete floor, while still attempting to stab McManus and Preston.

25. I struggled to gain control of Baez, and to get hold of his right arm, and saw that Baez had strapped the weapon to his right hand.

26. During this time, Baez continued to struggle against and try to fight McManus and Preston's attempts to disarm and subdue him, on the floor and against the side of the metal bed frame.

27. Baez continued to resist officers and to stab at us.

28. Baez was kicking violently, as well, and McManus tried to grab and hold his legs.

29. Correction Officers David Shaw and John Flowers were able to enter the cell behind me, and moved around us while we struggled to subdue and disarm Baez.

30. Shaw and Flowers tried to gain control of Baez's legs and arms, but Baez refused to desist, and continued to resist and attack.

31. During the struggle, Flowers was able to take hold of Baez's right arm with his two hands, and Shaw eventually was able to grab hold of the weapon.

5

32. In order to disarm Baez, two team members had to untie and cut away with safety scissors the ties that bound the weapon to Baez's hand.

33. Untying the weapon to disarm Baez took a was difficult because of the wraps he had tied to his hand, and because he continued to struggle violently.

34. The team members had to hold Baez down during this time until wrist and leg restraints could be applied to him before he could be extracted from his cell.

35. Baez continued to struggle violently with the team members while these procedures were followed.

36. Applying the cuffs took several minutes in the cell because Officer Flowers could not apply them until the cloth wrappings that Baez had applied to his wrists and ankles were untied and cut away with safety scissors.

37. Pursuant to 103 CMR 505, Baez could not be removed from the cell until he had both handcuffs and leg irons securing him, because he still posed a threat.

38. Regulations require that no inmate who is subjected to a forced cell extraction may be removed from his cell until restrained in handcuffs and leg irons.

39. 103 CMR 505 also requires that SMU inmates are not permitted outside of their cells without restraints.

40. During this time, Sgt. Cravedi continued to cut away the trip wires, clothing, and wrappings so that Baez could be extracted from the cell and strip-searched.

41. When secured in restraints, Baez was carried from the cell by the move team officers, and placed on a mattress on the floor in the corridor outside the cell so that the team could conduct a proper strip search and apply more secure restraints.

6

42. Officers Cravedi and Flowers cut away Baez's multiple layers of clothing and conducted a thorough strip search, looking for additional concealed weapons and other contraband, and then replaced the handcuffs with a waist chain.

43. Baez fought the search and the cutting away of his clothing.

44. When the search was completed, and Baez restrained by leg irons and waist chain, the team lifted Baez, placed him on a gurney, and brought him to the Nurse Protocol Room for a medical check by a nurse.

45. In the Nurse Protocol Room, I held Baez's right leg and shoulder and C.O. Shaw held a shield by Baez's face to prevent him from spitting on the medical staff while he was examined.

46. At about 11:50 p.m., the move team members were relieved from the Nurse Protocol Room by new officers coming on duty for the next shift, and, after a debriefing, we left SBCC.

47. I was in very close proximity to Baez from the time that I entered the cell until he was left in the custody of the relief shift. At no time did any officer strike Baez in the face with his hand or fist, or have improper contact with his genitals.

48. At all times when the extraction team members had contact with Baez, in subduing him, defending ourselves, disarming him, forcibly removing Baez from his cell, removing Baez's extra clothing and wraps, conducting the strip search, and applying the handcuffs, a waist chain, and leg irons, we necessarily had to have contact with Baez, to move Baez around and to reposition his body and his extremities. At all times, Baez continued to

7

resist officers and struggled with them. At no time did I see any officer touch Baez

improperly or more than necessary for self-defense, and to effectuate the forced

extraction, search Baez, or apply restraints.

49. Every physical contact with Baez by the extraction team members was necessary to the

cell extraction in the circumstances we faced and the dangerous threat we confronted.

Signed under penalty of perjury on this the ___9th___ day of July 2007.

David Bolduc



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Legal Division*
*70 Franklin Street, Suite 600*
*Boston, MA 02110-1300*
*(617) 727-3300 Ext. 124*
*www.mass.gov/doc*

Deval L. Patrick
*Governor*

Timothy P. Murray
*Lieutenant Governor*

Kevin M. Burke
*Secretary*

James Bender
Acting Commissioner

Nancy Ankers White
*General Counsel*

May 14, 2007

Michael Baez
MCI-Cedar Junction
P.O. Box 100
So. Walpole MA 02071

Re:    <u>Baez v. Maloney, et. Al</u>
       USDC CA 05-11045

Dear Mr. Baez:

Please be advised that I have not yet received your response to the defendants' request for admissions served on you on or about April 2, 2007. I understand that you were hospitalized for about ten days in the past month, and that you may need additional time to respond. Therefore, I am attaching a copy of the defendants' requests to this letter. As you know, pursuant to Fed. R. Civ. P. 36, a failure to respond to requests for admissions is considered to be an admission of the facts set forth therein.

Thank you for your attention to this matter.

Sincerely,

Margaret Melville
Staff Counsel

Encl.



EXHIBIT
D

⊕ Printed on Recycled Paper

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-11045-GAO

MICHAEL BAEZ,
    Plaintiff

        v.

MICHAEL MALONEY, et al.,
    Defendants

### DEFENDANTS' REQUEST FOR ADMISSIONS FROM THE PLAINTIFF

The defendants, pursuant to Fed. R. Civ. P. 36, submit the following requests for admissions to the plaintiff.

1.    On June 27, 2002, you refused to permit IPS Officer Charles Hooper to take photographs of injuries that you allege occurred during the use of force on June 27, 2002.

2.    In June 2002, you were "double-jointed," and you are able to slip out of handcuffs.

3.    Before June 2002, you had a disciplinary history for possessing weapons while in Department of Correction custody.

4.    On June 26, 2002, you disagreed with policy at the Souza Baranowski Correctional Center and throughout the day and night participated in a group demonstration with other inmates by refusing to return your meal trays.

5.    At various times throughout the day and evening of June 26, 2002, officers and mental health workers came to your cell door and encouraged you to submit to orders to cuff up and be removed from your cell.

6.    On June 26, 2002, you were communicating verbally with other inmates in the unit.

2

7.     On  June  26,  2002,  you  made statements to the other inmates in English and/or Spanish that you had weapons in your possession.

8.     On June 26, 2002, you told the other inmates that you looked like a "Samurai."

9.     On June 26, 2002, you believed that the officers were afraid of you.

10.    On June 26, 2002, you told the other inmates that the officers were afraid of you because of the weapons you had.

11.    On June 26, 2002, you told the other inmates that you would kill the dog if it was used.

12.    On June 26, 2002, you jammed the door to your cell.

13.    On June 26, 2002, you told the other inmates that you had created a trap in you cell for officers entering.

14.    On June 26, 2002, you stabbed at officers through the opened cell door slot with large broken pieces of the food tray.

15.    On June 26, 2002, you refused repeated attempts by staff to persuade you to submit to restraints without a move team.

16.    On June 26, 2002, you kicked through the cell door slot at an officer's shield.

17.    On June 26, 2002, you positioned yourself on top of your desk in your cell with your hands hidden.

18.    On June 26, 2002, when ordered to show your hands, you refused, leapt from the desk and charged at the door with two sharpened instruments strapped to your wrists.

19.    On June 26, 2002, SBCC staff had to take the door to your cell down before they could enter because you had so efficiently jammed the door and locks.

3

20. At some point during the night on June 26, 2002, you surrendered some of the broken pieces of the meal tray and sharpened weapons through the meal slot.

21. On June 26, 2002, at about 11:12 P.M., you refused another order to submit to being handcuffed through the cuff slot in the cell door.

22. On June 26, 2002, the SBCC locksmith had to be called to enable the move team officers to open your cell door and enter.

23. On June 26, 2002, as they tried to enter your cell, the move team officers had to cut through layers of webbing and trip wires you had fashioned and strung across your cell.

24. On June 26, 2002, your intent in stringing trip wires and cloth across your cell was to impede the move team from entering the cell and securing you in restraints.

25. On June 26, 2002, as the move team officers entered your cell, you jumped onto your bed and stood there with weapons aimed at the officers.

26. On June 26, 2002, the move team engaged in a struggle with you in your cell in order to try to place restraints on you.

27. On June 26, 2002, no chemical agents were used in your cell or on you.

28. On June 26, 2002, you covered the window in the door to your cell.

29. On June 26, 2002, you refused orders to remove the door window covering.

30. On June 26, 2002, as the defendants on the move team thereafter entered your cell, while you stood on the bed, you lunged at the officers with a homemade knife that was tied onto your hand.

4

31.    On June 26, 2002, other move team officers entered the cell behind the first move team and began cutting away the trip ropes.

32.    On June 26, 2002, you struck your face on the floor while you struggled with the officers in your cell.

33.    On June 26, 2002, you continued to stab at the move team officers until one officer was able to remove the weapon from your hand.

34.    On June 26, 2002, , the move team officers were unable to apply restraints to your wrists, ankles, and waist because of the many straps and wraps you had tied to your body.

35.    On June 26, 2002, officers had to spend some time trying to cut away all the straps and wraps you had applied to your body before they were able to apply restraints on you after entering your cell.

36.    On June 26, 2002, the move team officers carried you from your cell, and placed you on a mattress on the floor.

37.    On June 26, 2002, while you lay on the mattress on the floor, officers continued to cut away the straps you had wrapped around yourself, and they could not apply a waistchain until they had done so.

38.    On June 26, 2002, a nurse examined you immediately after you were carried from your cell.

39.    On June 26, 2002, the officers were able to place you on a gurney once you were adequately restrained, and then the officers took you to the nurse protocol room where you received treatment.

5

**40.**    Removing you from your cell on June 26, 2002, required more time, more move

team officers, and more force than that usually required to remove other similarly

situated inmates in maximum security because you posed a greater threat of harm to

the officers than other inmates.

Respectfully submitted,

The defendants,
By their attorneys,

Dated: April 2, 2007

NANCY ANKERS WHITE
Special Assistant Attorney General

_/s/Margaret Melville
Margaret Melville
BBO #477970
Department of Correction
Legal Office
70 Franklin Street, Suite 600
Boston, MA 02110
617-727-3300 ext. 149

## CERTIFICATE OF SERVICE

I, Margaret Melville, certify that on this day, I have served the plaintiff *pro se* in the above–
entitled action with a true and accurate copy of the foregoing and Certificate of Service at
his address of record, by First Class Mail, postage prepaid.

April 2, 2007

/s/ Margaret Melville
Margaret Melville

UNITED STATES DISTRICT COURT

DISTRICT OF
MASSACHUSETTS                                            C.A. No. 05-11045-GAO

|  |  |
|---|---|
| MICHAEL BAEZ,<br>    Plaintiff, | )<br>)<br>)<br>) |
| v. | )<br>) |
| MICHAEL MALONEY, ET AL<br>    Defendant. | )<br>)<br>) |

## CERTIFICATION OF RECORD

I, Maria Sazonick, certify that the attached documents represent a true, accurate, and complete copy of the administrative hearing record in the case of Michael Baez, Souza Baranowski Disciplinary Report No. 02-0810.

Signed under the pains and penalties of perjury this ❬26❭ day of October, 2005.

Maria Sazonick, Paralegal
Souza Baranowski Correctional Center

EXHIBIT

E

# SOUZA-BARANOWSKI CORRECTIONAL CENTER
## Massachusetts Department of Correction
## __DISCIPLINARY REPORT__



INMATE: __BAEZ, MICHAEL__    ID#: __W-69027__    HOUSING UNIT: __K-3 # 23__

DATE: __27 JUN 02__    D-REPORT #: __O2·O831__

OFFENSE: __ASSAULT ON STAFF__    CODE #: __2, 8, 15, 18, and 33 , 32__

MINOR/MAJOR __X__    REFERRED TO DISTRICT ATTORNEY: __XX__

REFERRED TO DDU SPECIAL HEARING OFFICER: __XX__

DESCRIPTION OF OFFENSE: _____

**On June 26, 2002, at approximately 11:08pm I was assigned to be shield person for a planned forced extraction of inmate Michael Baez W-69027. At approximately 11:11pm I entered the K-3 tier and approached cell #23 that housed inmate Baez.**

**At 11:16pm I was ordered into cell #23 to remove inmate Baez. As the door was opened and I entered the cell, I immediately saw his mattress and pillow blocking the entrance. As I stepped over the items inmate Baez charged at me with a sharpened instrument. The instrument was a white plastic material sharpened to a point and tied to his right hand. I immediately informed other team members of this weapon by annoucing "SHANK". Inmate Baez began to swing the sharpened instrument violently at me around the protective shield. The inmate did strike my upper arm with this weapon before he was restrained by fellow teammates.**

**Once the inmate was restrained I left his cell. The IPS Department took the sharpened instrument into custody.**

HAS INMATE BEEN PLACED ON AWAITING ACTION STATUS:    YES    NO

REPORTING STAFF PERSON'S NAME:    BRIAN McMANUS    VAC RELIEF
                                  (PLEASE PRINT)         (SHIFT & DAYS OFF)

REPORTING STAFF'S SIGNATURE:    _____

SHIFT COMMANDER'S SIGNATURE:    _Capt_ _____
DISCIPLINARY OFFICER'S SIGNATURE:    _Sgt Mauller_    7/3/02
FINDINGS & SANCTIONS(S), IF ANY:    _____
                                    (Transcribed from Disciplinary Hearing if major matter)

APPEAL RESULTS:    _____
REVIEWING AUTHORITY    _____
                                          Date



# SOUZA-BARANOWSKI CORRECTIONAL CENTER
## Massachusetts Department of Correction
## __DISCIPLINARY REPORT__

INMATE: __BAEZ, MICHAEL__     ID#: __W-69027__     HOUSING UNIT: __K-3 #23__

DATE: __27 JUN 2002__     D-REPORT #: __O2 - O830__

OFFENSE: __ASSAULT ON STAFF__     CODE #: __2, 8, 15, 18, and 33, 32, 16__

MINOR/MAJOR     __X__     REFERRED TO DISTRICT ATTORNEY: __X, X__

REFERRED TO DDU SPECIAL HEARING OFFICER:     __X)X__

DESCRIPTION OF OFFENSE: _____

On June 26, 2002, at approximately 11:08PM I was briefed by Lt. Lashua regarding a planned room extraction of inmate Michael Baez W-69027. I was assigned to be the Left Extremity person. At approximately 11:11PM I entered the K-3 tier and approached cell #23 which housed Baez.

At 11:16PM the team was ordered into the cell to remove inmate Baez. As I entered the cell I witnessed inmate Baez immediately lunge at Officer McManus with a sharpened instrument and repeatedly try to stab him with it. The weapon was made of a white plastic material and was tied to the inmate's right hand. As I made contact with the inmate he started to violently stab at me with the sharpened instrument. I was able to lower my head and allow my helmet to absorb the numerous strikes from the inmate.

Once the inmate was restrained I exited his cell. The IPS Department took the weapon into custody.

HAS INMATE BEEN PLACED ON AWAITING ACTION STATUS:     (YES)     NO

REPORTING STAFF PERSON'S NAME:     Edmund Preston          3x11    Mon/Tue
                                    (PLEASE PRINT)         (SHIFT & DAYS OFF)

REPORTING STAFF'S SIGNATURE:     _Edmund J Preston_

SHIFT COMMANDER'S SIGNATURE:     _Shawn Stewart_
DISCIPLINARY OFFICER'S SIGNATURE:     _Sgt Maul_     7/3/02
FINDINGS & SANCTIONS(S), IF ANY:
                                    (Transcribed from Disciplinary Hearing if major matter)

APPEAL RESULTS: _____
REVIEWING AUTHORITY _____
                                                        Date

# SOUZA-BARANOWSKI CORRECTIONAL CENTER
## Massachusetts Department of Correction
## **DISCIPLINARY REPORT**

*HSU*
*(16)*
*7/10*

INMATE: Baez, Michael    ID#: W69027    HOUSING UNIT: K-3 S-SMU

DATE: 6/26/02    D-REPORT #: 02-0810

OFFENSE:    CODE #: 1, 2, 3, 5, 8, 14, and 32

MINOR/MAJOR: X    REFERRED TO DISTRICT ATTORNEY: _____

REFERRED TO DDU SPECIAL HEARING OFFICER: _____

DESCRIPTION OF OFFENSE: _____

On Wednesday, June 26, 2002, at approximately 12:10 p.m., I, CO Benard, while assigned to the South SMU, was collecting meal trays in K-3 when inmate Baez, Michael W69027, refused to give up his tray. At this time, inmate Baez encouraged other inmates on the tier to do the same and other inmates began banging on their doors, flooding out, and covering up their windows. Inmate Baez' conduct disrupted the orderly running of the unit and necessitated that all activities be cancelled for the day.

Lt. Tibert and Sgt. Gonzalez notified.

E.O.R.

---

HAS INMATE BEEN PLACED ON AWAITING ACTION STATUS:    YES    NO    XX

REPORTING STAFF PERSON'S NAME: **Charles Benard, CO1**    **3x11    W/T**
                           (PLEASE PRINT)                 (SHIFT & DAYS OFF)

REPORTING STAFF'S SIGNATURE: *Charles H. Benard*

SHIFT COMMANDER'S SIGNATURE: *Shawn Downey*

DISCIPLINARY OFFICER'S SIGNATURE: *Sgt. Mullr* / 6/27/02
                                      (Transcribed from Disciplinary Hearing if major matter)

FINDINGS & SANCTIONS(S), IF ANY: _____

APPEAL RESULTS: _____

REVIEWING AUTHORITY _____
                                               Date

MCI-CEDAR JUNCTION
MASSACHUSETTS DEPARTMENT OF CORRECTION
DISCIPLINARY HEARING SUMMARY

INMATE: Michael Baez    #: W69027    Hearing Held at: Walpole

D-REPORT #: 02-0810,    REPORT DATE: 06-26-02
02-0830 & 02-0831.
HEARING DATE: 10-04-02    SPECIAL HEARING OFFICER: Donna Rizzi

1)  The inmate was given at least 24 hours notice of the hearing
(if no, attach 24 hour waiver).    YES x  NO

2)  The inmate is present before the hearing officer (if not,
attach refusal to appear form).    YES x  NO

3)  The inmate has been advised of his right to remain silent,
since the offense charged has, or may be referred to the District
Attorney.  The inmate has been further advised that his silence
may be used to draw an adverse inference against him, but his
silence alone may not be used to support a guilty finding.
                                         YES x  NO

4)  The inmate requested representation.    YES x  NO
4A) The inmate is represented by an attorney/law student.
                                         YES    NO x

4B) Name of legal representative:    See Page 1A - #3.

5)  The inmate requested the presence of the reporting staff.
                                         YES X  NO

5A) The reporting staff person is present.  YES X  NO
5B) If the inmate's request was denied, indicate the reason:N/A

6)  Inmate challenges impartiality of the Hearing Officer.
                                         YES    NO X
6A) If yes, state reasons why: N/A

7)  The hearing was tape recorded.    YES X  NO

*************************************************************
                    -NOTES-REQUESTS-MOTIONS-

                        See Page 1A

Page 2

Inmate:    Michael Baez                 D-REPORT #:02-0810,
                                        02-0830 & 02-0831

8)  Witnesses:  If none requested, check here

    A)  REQUESTED BY INMATE:  (If any witness request is denied, a
                              written explanation of the reasons
                              must be included as part of the
                              record).

       1) Thomas Somes

       2) Michael Simpson

       3)

    B)  REQUESTED BY HEARING OFFICER:

       1)

       2)

       3)

**************************************************************

9)  PRESENTATION OF EVIDENCE:

    A)  Inmate Statement.

    PLEA: #02-0810     No Contest # 1-3-8-14
          #02-0830     Not Guilty # 8-15-18-16-32-33
          #02-0831     Not Guilty # 8-15-18-32-33

Statement in defense (summary):

Inmate Baez chose not to make a statement regarding this
incident.

Page 2A

INMATE:    Michael Baez                    D-REPORT #:02-0810
                                           02-0830 & 02-0831

   B)Summary of Reporting Staff Person #1 Statement: C.O.
Bernard stated the following: On June 26, 2002 I was assigned to
the K3 Seg Unit.  Around noon time I was collecting the meal
trays by myself.  To collect the tray we go up to the window and
look in, open the food slot and the inmate usually walks over and
puts the tray in the slot.  When I went to Inmate Baez' cell he
refused.  His window was not blocked.  He told me no, he was
holding his tray along with the other inmates.  A total of ten
inmates refused to give their trays.  The inmates were all
yelling back and fourth that they were holding their trays and
not giving them up.  They also said they were going to flood out
and take it to the limit.  I was looking at Inmate Baez face to
face.  Michael was one of the last cells on the list.  The
inmates also banged on their doors, I saw Inmate Baez doing it.
Then they inciting to flood out, their toilets were clogged and
they would flush the toilet until the water went on the floor.  I
notified the Sgt. and officers were sent to shut off the water.
The toilets over flowed in their cells not out on the flats. All
rec time activities had to be stopped because of this behavior.
Eventually move teams were called in for all the inmates except
for one.  I was on duty from 7:00 M - 4:00 PM.  When I left at
4:00 PM they were just ready to go in on the first inmate.


SUMMARY OF REPORTING STAFF PERSON #2 STATEMENT: Sgt. Preston
stated the following: This was a planned extraction of several
inmates because they were disruptive and refused to be hand
cuffed to exit their cell.  I was assigned to the left extremity.
I was on four moves that day.  As an extremity person, when we
enter the cell and make contact with the inmate I control his
left side.  Lt. Lashua was in charge of this move and I take my
orders from him.  The move team approached Inmate Baez' cell at
least twice.  The first time we looked in the food slot he had
torn bed sheets strung out as trip wires.  He also had two broken
pieces of food tray attached on his right and left hand, tied on
as weapons.  Because of that we backed out and approached the
cell later.  I am the second person to enter the cell and Inmate
Baez was up on the bunk, standing with a sharpened piece of
plastic tied on his right hand.  The first two pieces of plastic
we saw, he kicked out of his cell later.  When we entered his
cell he only had the one weapon tied to his wrist.  As were
making contact with him he was making stabbing motions at us,
hitting is with the weapon.  I saw him trying to stab at C.O.

Page 2B

INMATE: Michael Baez                    D-Report : 02-0810,
                                        02-0830 & 02-0831.

REPORTING STAFF PERSON #2 STATEMENT CONTINUED: McManus around the
shield.  We got him off the bunk to the floor and then our next
concern was to get the weapon from him, Officer Shaw untied it
off his wrist.  I felt Inmate Baez stabbing my helmet, I lowered
my head to protect myself.  I was wearing helmet #H-5.  My final
contact with Inmate Baez was while he was being restrained.  We
carried him out of the cell to a mattress to be checked by
medical staff.  Then we carried him to the nurses protocol room.
Inmate Baez was fighting us the entire time and we guided him
down to the floor.  There were so many trip wires and everything
else he had set up everybody came down to the floor pretty hard.
Sgt. Preston identified weapon #02-167 as the one Inmate Baez had
tied on his hand when they entered the cell and said evidence
#02-165 & 02-166 were the two he had in his hands the first time
they approached the cell.  Because I lowered my head I was not
injured.  The weapon did not penetrate my helmet.  I did not
report to HSU or go off duty.  I was working the 3-11 shift this
day, I stayed a little over an hour to work overtime.

REPORTING STAFF PERSON #3 STATEMENT: C.O. McManus stated the
following: I was involved in four cell extractions on this day.
Inmate Baez lived in cell #23.  My move team leader was Lt.
Lashua.  I was assigned as the shied person and I am the first
one to enter the cell.  My role is to made the initial contact
with the inmate and shield him down to the floor.  The reason for
the extraction was for an incident that took place earlier in the
day and he also had weapons in his cell. The move team approached
his cell on two occasions.  I had the opportunity to look through
his food slot the first time we approached the cell, I held the
shield over the food slot.  I observed Inmate Baez sitting up on
his desk and he had a piece of sharpened meal tray tied to each
hand.  The team was pulled off the tier.  We went back 10-15
minutes later to do the actual move.  I was the first person in
the cell and as I stepped in I observed a mattress and pillow on
the floor that I had to step over, which slowed my progress going
in.  I saw Inmate Baez coming from the left side of his bunk
coming at me.  He had a weapon in his hand so I announced shank
to the other members of the team.  Inmate Baez was charging,
running up on the bunk at me.  The bunk is closet to the door.
Inmate Baez was coming towards me with a shank in his right hand.
After I stepped over the mattress and pillow he was swinging the
sharpened instrument and it struck my left upper arm.  It did not
puncture the skin.  Inmate Baez was reaching around the shield

Page 2C

INMATE: Michael Baez                    D-REPORT #: 02-0810,
                                        02-0830 & 02-0831


REPORTING STAFF PERSON #3 STATEMENT CONTINUED: trying to stab me.
I could see the wrist wrap on his hand.  It was a sharpened white
instrument, looked like a toothbrush.  At that time I put the
shield towards him more so he couldn't get a swinging range at us
and the team came in behind me and guided him to the floor.   I
secured his legs.  My final contact with Inmate Baez was holding
his feet while he was being restrained and then I held the shield
when he was being evaluated by medical staff.  I did see Inmate
Baez stabbing at Sgt. Preston as well.  No chemical agent was
used.   I saw C.O. Shaw unwinding the rope that was around Inmate
Baez' hand and he secured the shank.  I was not injured during
this incident.  When we went into the cell we didn't know if he
had a weapon or not.  Inmate Baez' cell floor was wet, his window
was covered, there were spider webs everywhere and his mattress
and pillow were blocking the door.  The floor was wet, it seemed
like it was water.  I worked 7-3 shift that day and I  was forced
to work overtime from 3-11 too.  C.O. McManus identified evidence
#02-167 as the weapon Inmate Baez used to stab him in the arm.

Page 3A

INMATE: Michael Baez                     D-REPORT #: 02-0810,
                                         02-0830 & 02-0831.

D) *DOCUMENTARY EVIDENCE:*
        In addition to the Disciplinary Report, the Hearing
Officer accepted into evidence, and considered the following
documents, physical evidence, photographs/video tapes:
1.  Procedural Time Limit Waiver signed on 06-28-02.
2.  Use of force cover letter (2 pages).
3.  Incident report written by Lt. Lashua (3 pages).
4.  Incident report written by M.H. Radosta.
5.  Incident report written by C.O. McManus (2 pages).
6.  Incident report written by Sgt. Preston (3 pages).
7.  Incident report written by C.O. Bolduc (2 pages).
8.  Incident report written by C.O. Shaw (3 pages).
9.  Incident report written by C.O. Rackett.
10. Incident report written by Maint. Stone.
11. Incident report written by Sgt. Flowers (2 pages).
12. Incident report written by Sgt. Cravedi.
13. Incident report written by C.O. Gonzalez.
14. Incident report written by Lt. Tibert.
15. Incident report written by C.O. Hooper.
16. Incident report written by Sgt. Cruz.
17. Incident report written by C.O. Texeira.
18. Incident report written by C.O. Harvey.
19. Use of chemical agent Attachment A.
20. Incident report written by R.N. Trychon.
21. Incident report written by C.O. Martin.
22. Photographs:5 of cell, 7 of the weapons & 4 of Inmate Baez.
23. Photocopy of South SMU Log for 06-26-02 (2 pages).
24. Video tape of this 06-26-02 incident.
25. Restitution form for $557.00.
26. Three photographs of Helmet #H-5 worn by Sgt. Preston (3).
27. Medical bills submitted by Inmate Baez (2 pages).
28. Affidavit written by Inmate ████████████
29. Affidavit written by Inmate ████████████ (2 pages).
30. Medical documentation submitted by Inmate Baez (18 pages).
31. Time Limit Waiver   RE: Results of hearing.'
32. Request for witness form   RE: Inmate ████████████
33. Evidence #02-167 One hand made weapon constructed from a
toothbrush - sharpened on one end - other end wrapped in sheeting
and had a loop.
34. Evidence #02-165 & #02-166 Two hand made weapons constructed
from a plastic meal tray, both were sharpened and had a loop.
35. Evidence #02-168  - 22 pieces of a broken meal tray recovered
from Inmate Baez' cell by Lt. Tibert.

Page 4

INMATE: Michael Baez                    D-REPORT #:02-0810,
                                        02-0830 & 02-0831.

FINDINGS: #02-0810 / Guilty: 1-3-8-14    Dismiss: 2-5-32
          #02-0830 / Guilty: 8-15-18/32  Dismiss: 2-16-33
          #02-0831 / Guilty: 8-15-18/32  Dismiss: 2-33

Statement of evidence relied upon to support findings: This
Hearing Officer has determined the following: that Inmate Baez'
guilt in the above charges is undeniably established by a
preponderance of the evidence.  This decision is based on the
evidence and testimony presented at this hearing.  C.O. Bernard
testified that he was assigned to the K 3 Seg Unit.  He said he
was collecting the meal trays at noon time and Inmate Baez
refused to give back his tray (1) and said he was holding his
tray along with the others.  C.O. Bernard said that a total of
ten inmates refused to turn over their trays (14) and that they
were all yelling back and fourth that they were going to flood
out, so their water was secured.  He further stated that all
activities in the unit were stopped because of their behavior
(8).  Lt. Tibert documented in his incident report, Exhibit #14,
that he gave all the inmates additional orders to comply and they
all refused (1), Inmate Baez being one of them.  He also noted
that because of their behavior move teams needed to be assembled
(8).  Sgt. Preston testified that he was assigned to the left
extremity part of the move team.  He said the first time the move
team approached Inmate Baez' cell, he looked through the food
slot and observed Inmate Baez with a weapon tied to each hand and
because of that, the team had to back out and approach the cell
again.  These two weapons were presented and identified by Sgt.
Preston as Exhibit #34.  He said when he approached Inmate Baez'
cell the second time he was the second person in the cell.  He
said Inmate Baez was up on his bunk with a sharpened piece of
plastic tied to his right wrist (15) and Inmate Baez was making
stabbing motions towards staff.  During this time he said Inmate
Baez did stab (18/32) his helmet several times.  The photographs
presented of this helmet, Exhibit #26, clearly show marks from
the weapon on the top and front of it.  C.O. McManus testified
that he looked through the food slot the first time the move team
approached the cell and he also saw Inmate Baez standing in the
cell with two weapons tied to his hands.  He said the move team
backed away and went back later.  He said he was assigned as the
shield man and he was the first one to enter Inmate Baez' cell.
When he entered the cell he observed Inmate Baez coming at him
from the left side and he had a weapon in his hand (15) so he
announced shank to the other move team members.  He said Inmate

Page 4B

INMATE: Michael Baez                    D-REPORT #:02-0831
                                        02-0830 & 02-0831.

SANCTIONS & RECOMMENDATIONS:
(1) (3) (8) (14) (15) (18/32) - Thirty-six (36) Months DDU
                                Credit Three (3) Months in Seg
                                Thirty-three (33) Months DDU to
                                Serve.

Reason for sanction: The imposed sanction is deemed appropriate
by this Hearing Officer due to the serious nature of the offense.
A review of Inmate Baez' six part folder reveals that he has
received over eleven disciplinary reports in the past for
offenses which include fighting, being in possession of a weapon
and assaulting staff.  In addition, Inmate Baez is currently
serving a 31 month sentence in the DDU for assaulting another
inmate with a weapon.  This sanction is intended to demonstrate
to Inmate Baez that his assaultive behavior towards staff is
totally unacceptable and will not be tolerated.

The inmate has been advised of his right to appeal this decision

within 15 days upon receipt of these results to the Deputy

Commissioner of Corrections:    X

Special Hearing Officer: Donna Rizzo

Date: 10-11-02

The inmate has been advised of the Hearing Officer's decision and
a copy of these findings has been served to the inmate:

Staff Signature                    Date: 10-11-02